STATE OF NEBRASKA, APPELLEE, v. RANDY GALEN BOOTH, APPELLANT.

276 N. W. 2d 673

Filed March 20, 1979. No. 42195.

Jack R. Knicely, for appellant.

Paul L. Douglas, Attorney General, and Harold I. Mosher, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

HASTINGS, J.

Defendant appeals his conviction for possession of amphetamines with intent to distribute, deliver, or dispense. He assigns as error the overruling by the trial court of his motion to suppress certain evidence seized without a search warrant and without an arrest warrant and the subsequent admission of that evidence at the time of trial, the refusal to give certain requested instructions, the admission of certain opinion evidence, and the overruling of defendant's motion for a directed verdict because of insufficiency of the evidence.

On June 4, 1977, David Bickford, a longtime resi-

dent of Sidney, Nebraska, drove over to the home of his 21-year-old son, Mark, to pick up some building material. Present were Mark, Terri, who is Mark's present wife, and the defendant. It appeared to him that an argument was in progress and he inquired of Terri what the problem was. She informed him that "Mark had just taken a needle or injected a needle in his arm." When Bickford asked his son what the story was he told him to mind his own business. He stated that his son was acting strangely, that he didn't see him use any drugs, but assumed that he had and that he had gotten them from the defendant. Mr. Bickford then relayed this information to deputy sheriffs Mark K. Teel and Charles D. Wolford.

Deputy Teel testified that he had been in law enforcement work since 1972, and a deputy sheriff since October 1, 1975; that he had attended several courses and seminars on narcotics and dangerous drugs, and on his own had studied a book entitled "Drugs and Abuse," issued by the Bureau of Narcotics and Dangerous Drugs, U. S. Department of Justice; that he had made from 50 to 60 arrests for drug-related crimes. He stated he was well acquainted with the defendant and had arrested him on two prior occasions and had searched his house on January 6, 1977, pursuant to a warrant, and had found various drug paraphernalia, such as scales, syringes, needles, bent spoons, and suspected marijuana. As of June 4, 1977, he was aware of the fact that defendant had been convicted of possession of marijuana, possession of firearms, and burglary, and that other deputies had told him when he first came on the force to observe defendant whenever possible as he was suspected of dealing in narcotics because they previously had searched his premises and found growing marijuana and firearms and suspected cocaine. He also related that Mr. Bickford had told him substantially the information set out above, and in addition that defendant was "try-

ing to get his son to shoot up with him" and that "it was time something was done."

The two deputies then proceeded downtown and very soon observed defendant driving his vehicle which they then followed to a point where he drove into a service station. The deputies parked diagonally across the street. They observed defendant pull up near the pop machine, get out of his car, go into the office, apparently purchase something, and return to his car. He pulled up to and past the gas pumps and started out into the street, at which time the deputies started their car. The defendant looked across the street and saw them, backed his car up to the gas pumps, and proceeded to fill his tank. Following this, defendant went into the office, apparently to pay for the gas, came out, and walked around to the rear to the restrooms. The deputies then pulled across the street and into the service station, met defendant, and while deputy Wolford went into the restroom to search for possible concealed contraband, deputy Teel told defendant he wanted to talk to him. The deputy noticed that defendant had a curved metal spoon hanging from the right side of his pants, and told him he had reason to believe that defendant was transporting narcotics. Defendant was barefooted and dressed only in a tank-top shirt and pair of trousers.

Deputy Teel instructed defendant to place his hands on his car and he was frisked. The only thing found was a crude homemade pipe that, according to the deputy based on his experience, was of the type used to smoke marijuana and which contained a residue suggestive of burned marijuana. Defendant was advised that the deputy had reason to believe that he was transporting narcotics in his vehicle, at which time defendant appeared to be getting very nervous and commenced rubbing the inner portion of the bowl of the spoon with his thumb. Deputy Wolford started reading defendant the

Miranda warnings and Teel proceeded to search the auto on both sides of the front seat, on top, and beneath the seat. Underneath the seat on the driver's side a tin Sucrets container was found containing several small white tablets suspected to be amphetamines, five syringe needles, one 1 cc. plastic syringe, a clear plastic bag containing green leafy materials, an aspirin container containing a blue tablet, a Coke bottle cap, and a razor blade. Defendant was then informed that he was under arrest for possession of amphetamines.

After obtaining defendant's permission, deputy Wolford drove his automobile to the courthouse, while deputy Teel took defendant in the patrol car and booked him into jail. Defendant's car was locked, and about 1½ hours later the deputies made an inventory search of defendant's auto and found 700 or 800 amphetamine tablets in the ashtray. This search was also made without a warrant.

In our judgment, the original contact with defendant was justified. The deputies had received a complaint of possible law violation from a citizen and resident of the community about a person whose prior criminal activity was known to the officers. Section 29-829, R. R. S. 1943, authorizes a peace officer to stop "any person in a public place whom he reasonably suspects of committing, who has committed, or who is about to commit a crime and may demand of him his name, address and an explanation of his actions." Furthermore, it is the duty of a sheriff or his deputy "to ferret out crime * * * and insofar as it is within his power, to secure evidence of all crimes committed in his county, and present the same to the county attorney * * *." § 23-1710, R. R. S. 1943. Finally, as stated in State v. Brewer, 190 Neb. 667, 212 N. W. 2d 90 (1973): "A police officer may in appropriate circumstances and in an appropriate manner approach a person for the purpose of investigating possible criminal behavior

even though there is no probable cause to make an arrest. Adams v. Williams, *supra*."

However, as the initial contact was developing, certain additional factors appeared to the officers giving them probable cause for a warrantless search, remembering that the existence of "probable cause for a warrantless search must be determined on the particular facts and circumstances of each case" which "must be determined by a practical and not by any technical standard and where time is of the essence it is a highly relevant factor in evaluating the circumstances." State v. Forney, 182 Neb. 802, 157 N. W. 2d 403 (1968). In addition to the information given the officers by Mr. Bickford which admittedly, by itself, would not have furnished "probable cause," they knew from their own experience, plus information received from other law enforcement officials, that defendant had been arrested for drug violations and had been, in the past, found to have in his possession drugs, certain drug paraphernalia including bent spoons, as well as firearms. Knowledge on the part of law enforcement officers of previous law violations of the suspect is a factor to be considered in establishing probable cause for search or arrest for a similar crime. See State v. Irwin, 191 Neb. 169, 214 N. W. 2d 595 (1974). Also, " 'probable cause * * * can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest,' when there is 'some degree of communication between the two.' " United States v. Nieto, 510 F. 2d 1118 (5th Cir., 1975).

With this information in mind, the officers observed the defendant starting to leave the station, driving past the gas pumps and part way into the street, when upon seeing the deputies he immediately backed up to the pumps, pumped some gas into his tank, went into the office, and when he saw the officers approaching, headed for the restroom.

From their experience, the deputies had reason to suspect that defendant might try to hide or dispose of contraband. These actions would fall within the "furtive gesture" rule which had its genesis in Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889, and was expanded upon in Sibron v. New York, 392 U. S. 40, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968), which provides that a furtive gesture when coupled with prior reliable information may constitute probable cause for search or arrest. In the latter case the court stated at p. 66 that "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest."

When deputy Teel first stopped the defendant, he observed the bent spoon hanging from his pants top, which, coupled with his training, experience, prior knowledge of the defendant, and information related to him earlier in the day, would support grounds for his believing that defendant either had committed or was about to commit the crime of illegal use of drugs. Circumstances and conduct which may very well not excite the suspicion of the ordinary person might be highly significant to a law enforcement officer trained in the habits and conduct and paraphernalia of users of drugs. Deputy Teel possessed such expertise. See State v. Benson, 198 Neb. 14, 251 N. W. 2d 659 (1977).

Therefore, we feel that there were sufficient grounds for the initial "pat-down" search which revealed the presence of a pipe which in the officer's opinion contained residue of smoked marijuana.

The search of the automobile at the scene was entirely justified by the knowledge possessed by the deputies. "Probable cause for searching a motor vehicle is to be determined in view of its mobility

and by a practical and not a technical standard, and differs from that required to search a fixed structure." State v. Connor, 189 Neb. 269, 202 N. W. 2d 172 (1972). See, also, Carroll v. United States, 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543. It was this search, which revealed the presence of amphetamines, that formed the basis of the arrest for possession of a controlled substance.

The second search was performed at the station house approximately 1½ hours after the defendant had been placed in jail. Defendant cites Chambers v. Maroney, 399 U. S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970), for the proposition that a search made at the police station sometime following the arrest after the defendant is in custody is not incident to the arrest and therefore is not justified in the absence of a warrant. However, defendant does not go far enough in his quotation from Chambers, *supra*, nor is he correct in stating in his brief that deputies Teel and Wolford did not have probable cause for the first search at the filling station before the arrest.

It is necessary to read on in Chambers, *supra*, as follows: "Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

"On the facts before us, the blue station wagon could have been searched on the spot when it was

stopped since there was probable cause to search and it was a fleeting target for a search. The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained."

As we have held, there was probable cause for the initial cursory search at the scene and there still remained probable cause for the search at the station house which revealed the large quantity of amphetamines that was the basis of this prosecution. It is not necessary to discuss the legitimacy of an "inventory search." The seizure of the evidence was proper and so was its reception in evidence at the trial.

Defendant complains of the trial court's failure to give his requested instructions numbered 1 and 5, which required that the jury find that defendant "physically or constructively possessed a controlled substance," that "he had knowledge of the presence of the substance and its character," that "he possessed it with the intent to deliver," and that "proof of guilty knowledge may be made by evidence of acts, declarations or conduct of the accused." The court instructed in the exact words of the statute that the State must prove that defendant "Knowingly or intentionally possessed a controlled substance, to wit, amphetamine: With the intent to distribute, deliver or dispense * * *." If, as required by the court's instructions, the jury had to find that defendant knowingly or intentionally possessed a controlled substance, it would stand to reason that he had physical or constructive possession and had knowledge of its presence and character as a controlled substance as covered in the proposed instructions.

That proof of guilty knowledge may be made by evidence of acts, declarations, or conduct of the accused, is certainly no different than instruction No. 8, also NJI No. 14.11, given by the court, which told the jury that defendant's intent was a material element of the crime and may "be inferred from the words and acts of the defendant and from the facts and circumstances surrounding his conduct." As stated in State v. Bolden, 196 Neb. 388, 243 N. W. 2d 162 (1976): "The trial court may refuse a requested instruction where the substance of the request is covered in the instructions given." There is no merit in this assignment of error.

Defendant's objection to the admission of opinion testimony of deputy Teel and Michael L. Auten, a chemical expert, as to burned marijuana residue in the pipe and as to the analysis of the vegetable matter taken from the auto, is based on foundation and relevance. Suffice it to say that both witnesses qualified as experts in their respective fields to permit their testimony under section 27-702, R. R. S. 1943. Furthermore, although not forming the basis for the charge in the instant case, the seizure and identity of the substance as marijuana was one of several facts and circumstances furnishing the basis for probable cause for search and arrest.

Finally, there is no question but what the evidence, if believed by the jury, was sufficient to justify a guilty verdict. "This court will not interfere on appeal with a conviction based upon evidence unless it is so lacking in probative force that the court can say as a matter of law that it is insufficient to support a verdict of guilt beyond a reasonable doubt." State v. Sommers, 201 Neb. 809, 272 N. W. 2d 367 (1978).

The judgment is affirmed.

AFFIRMED.

KRIVOSHA, C. J., concurs in result only.

McCOWN, J., dissenting.

From the time the police officers saw the defendant drive into the service station until the time they arrested him and searched his car they obtained no more relevant information on the issue of probable cause than they already had. If the police officers here did not have probable cause for the arrest and search when they first saw the defendant drive into the service station, they did not acquire probable cause from the defendant's "furtive" actions in filling his gas tank and going to the restroom. To put gas in a car at a service station open for business and then walk to the restroom in broad daylight is neither stealthy, secret, surreptitious, nor furtive. Neither can such actions be said to constitute flight.

The essence of the majority holding here is that if police officers know that a suspect has been previously convicted of a crime, and they have reasonable grounds to suspect that he may also have committed another crime of the same nature, and the officers are looking for him in order to question him, then any actions by the suspect which the officers subjectively interpret as an effort to avoid or delay meeting them is sufficient to constitute probable cause for arrest and search.

Reasonable grounds for suspicion cannot be equated with probable cause so easily. Neither does a walk to the restroom transform a reasonable suspicion into probable cause for an arrest and search.

WHITE, J., joins in this dissent.