**UNITED STATES of America**

v.

**Roy Lee MARKLAND, Jr.**

**Crim. No. N–79–106.**

United States District Court,
D. Connecticut.

May 15, 1980.

---

Richard Blumenthal, U. S. Atty., Thomas S. Luby, Asst. U. S. Atty., New Haven, Conn., for plaintiff.

Kevan Acton, Asst. Federal Public Defender, New Haven, Conn., for defendant.

## RULING ON MOTION TO SUPPRESS

### EGINTON, District Judge.

Defendant, Roy Lee Markland, is charged in a six-count indictment with delay and theft of the mails in violation of 18 U.S.C. §§ 1703, 1708, and 1709. He has moved, pursuant to 18 U.S.C. § 3501 and Fed.R. Crim.P. 12(b)(3) and 41 to suppress from use in evidence at trial all statements and all tangible evidence. The motion to suppress

tangible evidence is based on defendant's assertion that the warrantless search of a plastic bag was without probable cause and in violation of the Fourth Amendment. An evidentiary hearing has been held and the issues have been briefed. The following Ruling constitutes this court's findings of fact and conclusions of law as required by Fed.R.Crim.P. 12(e).

## FINDINGS OF FACT

1. During the rainy evening of Saturday, August 11, 1979, defendant Roy Lee Markland, Jr., a Post Office supervisor, was driving his private jeep along Interstate I–95 in Milford, Connecticut. At approximately 7:00 p. m. as he turned onto Exit 34, the jeep smashed into the guard rail of the exit ramp, slid along the full length of the rail and turned on its side. The impact smashed the vehicle's windows and scattered an opaque plastic cooler, papers and coins over the surrounding area.

2. Trooper Anthony Fragoso of the Connecticut State Police was notified of the accident at 7:10 p. m. and arrived at the scene ten minutes later. Upon his arrival, he was informed that the operator and sole occupant of the vehicle was already in the ambulance. He spoke with the person in the ambulance, who identified himself as the driver of the vehicle, and provided a license in the name of Roy Lee Markland. Though Fragoso smelled alcohol on the operator's breath, he found Markland's responses coherent and he appeared to the trooper to be in full control of his senses.

3. Before the ambulance departed for the hospital, Fragoso told Markland he would meet him at the Milford Hospital Emergency Room. Fragoso then returned to the jeep which was still on its side. The vehicle's windows had been broken and small change, many papers and a zippered plastic thermal bag with "Schlitz" markings were scattered on the grass near the jeep. Fragoso cleaned up the area, collecting the coins and papers. When he picked up the plastic bag, he was surprised at its weight. Assuming it might contain beer or some other alcoholic beverage, he opened the bag.

Inside the cooler, Fragoso found two mailed parcels addressed to Sam Sloat, Inc., of Westport, Connecticut. The parcels carried the return addresses of out-of-state individuals.

4. Fragoso called a private towing service to take the jeep from the scene to a private garage. The jeep was never seized or impounded by the State Police. Fragoso did, however, seize the property found on the scene, allegedly pursuant to Connecticut State Police Special Order 31A. Special Order 31A deals with the handling and inventorying of found property and evidence. Fragoso, however, never prepared an inventory of the property he collected from the scene, though he receipted the parcels when they were later turned over to the postal inspectors.

5. After noting that the parcels were neither addressed to Markland nor from Markland, Fragoso concluded that the parcels must be stolen. He learned from the papers scattered about the scene that Markland was a Post Office supervisor.

6. Upon the advice of Trooper William Cannon, who arrived on the scene after Fragoso, Fragoso decided to contact the postal service. He proceeded to the mail terminal in New Haven and called Postal Inspector Ronald Cesa. Cesa advised Fragoso that he was investigating other thefts of Sam Sloat parcels from the mail. The two men arranged to meet at the West Haven Toll Plaza. Cesa requested that Fragoso not release the defendant until he (Cesa) had an opportunity to speak with him.

7. After calling Cesa, Fragoso went to the West Haven Toll Plaza and deposited the items seized at the accident site. He then proceeded to the Milford Hospital Emergency Room to pick up Markland. Trooper Cannon had called the hospital to instruct them that Markland was not to leave pending the police arrival to pick him up. When Fragoso arrived, he arrested Markland for reckless driving (driving at an unreasonable speed for the road conditions) and told him he was taking him to West Haven. The defendant was handcuffed and placed in the police cruiser. Fragoso then read a *Miranda* warning card and Markland indicated he understood his rights. They then drove to the West Haven Toll.

8. The normal procedure in the State of Connecticut for prosecution of a reckless driving offense involves the issuance of an Infractions Complaint which permits the entry of a guilty plea by mail and payment of a fine set forth on the face of the complaint.

9. When Markland arrived at the West Haven Toll Plaza, he was taken to a small (10 feet x 15 feet) room at the State Trooper station. The items Fragoso had seized were on a table; the parcels were still in the "Schlitz" cooler. After a short time, Markland began to complain of pain in his back and in his legs. Because of defendant's complaints, Fragoso returned him to the hospital.

10. At the hospital, the attendants x-rayed Markland and gave him an injection. The defendant was told that the injection was a pain killer, but it was in fact only water. Markland nevertheless indicated that it made him feel better.

11. While Fragoso and Markland were at the hospital, Postal Inspectors Cesa and Thomas Carroll arrived at the West Haven Toll Plaza. Trooper Cannon advised them that Markland had returned to the hospital. The trooper then gave the parcels to the inspectors and the three officers travelled together to the hospital.

12. At the conclusion of Markland's treatment at the hospital, Fragoso told the defendant that they would return to the West Haven Toll. In the police cruiser, Markland was again advised of his rights and the defendant again responded coherently and appropriately to questioning, stating, "I know my rights." After Markland had been handcuffed and seat-belted into the police cruiser, Trooper Cannon and Postal Inspectors Cesa and Carroll arrived at the hospital. Instead of returning to West Haven, the officers agreed to proceed together to the offices of the postal inspectors at the Church Street Post Office in New Haven.

13. Markland rested comfortably during the half-hour trip to New Haven, but when

he and the officers arrived at about 11:50 p. m., he had difficulty walking from the police cruiser into the building. He was limping and not able to move very quickly.

14. At the Post Office, the state troopers commenced their paper work, and the postal inspectors formally identified themselves to the defendant. After Fragoso and Cannon had completed their reports and had handed Markland a summons for reckless driving, Cesa read Markland his rights from a *Miranda* form and instructed the defendant to read them for himself. After he indicated that he understood, Markland was asked to initial each right and to read the waiver clause. After Markland had initialed each right, he stated that he understood the waiver clause and signed and initialed that clause. Cesa then asked the defendant why he had the parcels. Markland replied, "Because I'm an asshole, I didn't do anything wrong. I want to have an attorney present before I say any more."

15. Cesa immediately ceased questioning and left the room to call an Assistant United States Attorney. Carroll, who had been present when Markland was advised of his *Miranda* rights and had heard Markland declare that he wanted an attorney, approached Markland a few minutes after Cesa left the room and asked him why he had the parcels. In response, Markland indicated that he had known of the theft of Sam Sloat parcels for about four years, ever since some postal inspectors had visited Markland while checking on the losses, and that in an effort to assist he had been conducting his own investigation.

16. At no time did the law enforcement officials attempt to contact an attorney for Markland nor did they offer him use of a telephone.

17. Shortly after his conversation with Carroll, Markland was taken to the Whalley Avenue jail in New Haven to await presentment before a magistrate.

## CONCLUSIONS OF LAW

### I

Defendant first questions the propriety of Trooper Fragoso opening the plastic "Schlitz" bag. He argues that this court should suppress the bag and its contents because the search was made without a warrant and without probable cause, and does not come under any of the exceptions to the warrant requirement. This court agrees. For the reasons discussed below, the bag and its contents are suppressed from use in evidence at trial.

### A

The government contends that the search can be sustained on either of two grounds. First, it argues that the cooler was abandoned property. Since no one can claim a protectable privacy interest in abandoned property, it reasons, the search could not have been in violation of the Fourth Amendment.

Under any definition of abandoned property, however, Markland's plastic bag was not abandoned. In order to abandon property, the erstwhile owner must voluntarily relinquish all title and/or right to possession. In essence, it requires the "virtual intentional throwing away of it." *Foulke v. New York Consolidated R. R.*, 228 N.Y. 269, 127 N.E. 237 (1920). From its position just a few feet away from the car, it was obvious that the bag belonged to Markland and at no time did Markland deny his ownership. *United States v. Colbert*, 474 F.2d 174 (5th Cir. 1973). Neither the involuntary expulsion of the bag from the car during the accident nor Markland's failure to collect his possessions before leaving the scene of the accident can be interpreted to indicate an intent to abandon all title and right to possession, such as that which can be implied by one throwing property into a trash heap. *United States v. Alden*, 576 F.2d 772 (8th Cir. 1978). Nor can an intent to abandon the property be implied by the duration of Markland's absence from possession. *United States v. Cowan*, 396 F.2d 83 (2d Cir. 1968). Markland merely left his property temporarily in order to obtain medical treatment; both he

and Fragoso expected that he would resume possession of the material as soon as he was released from the hospital.

## B

As a second ground for sustaining the search the government argues, more credibly, that the opening of the plastic bag by Fragoso constituted an administrative inventory search of the type sanctioned by *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). As such, there was no need for either a warrant or probable cause.

Defendant contests the applicability of *Opperman* to these facts. First, he notes that the "standard police procedure" detailed at the hearing cannot support this search because the documents introduced at the hearing relate only to the inventorying of "found" property and evidence. The property could not have been "found", he argues, since it obviously belonged to Markland. If the search was not conducted pursuant to an established police procedure, he concludes, it cannot be justified as a reasonable inventory search. Even if the claimed special orders apply, defendant argues that in this case the established police procedures cannot support the search of the bag, because Fragoso never followed the procedural requirements; he never prepared a record of the items he found.

In *South Dakota v. Opperman, supra,* the Supreme Court held that a routine inventory search of the contents of an impounded automobile, conducted pursuant to standard police procedures for a non-investigatory purpose, was not "unreasonable" under the Fourth Amendment. The Court noted that such searches need not be justified by probable cause, because the notion of probable cause relates primarily to criminal investigations and is irrelevant in the context of

analyzing the reasonableness of routine administrative caretaking functions. 428 U.S. at 370, n.5, 96 S.Ct. at 3097, n.5. Resolution of the question of the constitutionality of routine inventory searches requires a court to weigh the governmental and societal interests advanced to justify intrusions against the constitutionally protected interest of the individual citizen in the privacy of his effects. 428 U.S. at 378, 96 S.Ct. at 3101 (Powell, J., concurring); *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

The *Opperman* Court applied this balancing test, emphasizing, on the one hand, a citizen's diminished expectation of privacy in his automobile,[1] *United States v. Martinez-Fuerte,* 428 U.S. 543, 560–63, 96 S.Ct. 3074, 3084–85, 49 L.Ed.2d 1116 (1976); *United States v. Carr,* 584 F.2d 612 (2d Cir. 1978), and noting, on the other hand, that the inventorying of the contents of seized and impounded vehicles was a reasonable response to three distinct governmental and societal needs: (1) the need to protect the owner's property while it remains in police custody, (2) the need to protect the police from claims of lost or stolen property, and (3) the need to protect the police and the general public from potentially dangerous instrumentalities. *South Dakota v. Opperman, supra,* 428 U.S. at 369, 96 S.Ct. at 3097. In striking the balance, the Court found that, in the case of vehicle inventory searches, the intrusion into the limited individual privacy interest was far outweighed by the caretaking interest of the police and the community.

■ A principal assurance of the Fourth Amendment reasonableness of an inventory search is that it is conducted for non-inves-

---

1. The expectation of privacy in an automobile is diminished by two factors: the extent of government regulation and the public nature of a car. In furtherance of the State's interest in public safety, the government has frequent and pervasive contact with and control of automobiles. They are subject to licensing and periodic inspection and can be stopped on the high-

way at any time to assure that these matters are in order. Moreover, as the Supreme Court has observed, automobile travel is "obviously public," with the occupants and contents of cars ordinarily in plain view. *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

tigatory purposes [2] pursuant to standard police procedures. The routine nature of such a search tends to ensure that the intrusion will be limited in scope to the extent necessary to carry out the caretaking function. *South Dakota v. Opperman, supra,* 428 U.S. at 375, 96 S.Ct. at 3100 (Powell, J., concurring). In this case, though the government has educed evidence that standard procedures require the state trooper at the site of an accident to collect and inventory the personal property of any accident victim unable to care for the property himself, it has been unable to produce any other writing which embodies this policy. In its brief, the government relies solely upon HQ Special Order 31A, "Possessed Property," to support the reasonableness of the search and seizure involved here.

HQ Special Order 31A does not apply to the seizure and inventorying of the contents of the jeep. By its terms, it is concerned with the establishment of "a uniform policy for the custody of seized property" and the insurance of "the sanctity of the chain of evidence." It applies only to property which has been seized as evidence, or to material which comes into the possession of the State Police Department as "found" property. In the case of found property, the special order is designed to "assure that the rightful owner, the finder or other person having a legal claim to such property may recover it in essentially the same condition as originally delivered to [police] control."

At the time of the search, the plastic bag could not be classified as either evidence or found property. Fragoso clearly understood that the owner of this property was the defendant who could be found at the Milford Hospital and who would take the property into possession when his treatment had been completed.

◼ The inapplicability of the proffered special order does not, however, necessitate a finding that the collection of Markland's property constituted a search [3] and that such a search was not reasonable. An inventory search may be reasonable even in the absence of direct evidence concerning standard police procedures. *United States v. Prescott,* 599 F.2d 103 (5th Cir. 1979).[4] In this case, while there is no writing attesting to standard procedures, Trooper Fragoso testified credibly that he was instructed at the Police Academy to collect and to inventory all property found at the scene of an accident before taking such property into his possession, even if only for a short time. Such a policy is reasonable and necessary. The interests which the inventory search serve—protection of the owner's property, protection of the police

---

**2.** There is no question that the searches in this case (the collection of Markland's property and the opening of the plastic cooler) were non-investigatory. Fragoso testified that he opened the plastic bag because he was surprised at its weight but he admitted, candidly, that he neither suspected nor had reason to suspect that the bag contained contraband.

**3.** Given the benign, non-criminal context of the intrusion in these matters, many courts have questioned whether an inventory constitutes a search for Fourth Amendment purposes. For example, in *United States v. Prescott,* the court commented that the police officer's "intrusion was so minor that it barely warrants characterization as a search at all." 599 F.2d 103, 105 (5th Cir. 1979). This court concurs in the Fifth Circuit's observation; the intrusion into Markland's privacy occasioned by Fragoso's collection of his personal effects was so minor that it can hardly be called a search. Nevertheless, this court finds it efficacious to analyze the trooper's actions in the context of the Supreme

Court's opinion in *South Dakota v. Opperman. See* 428 U.S. at 370, n.6, 96 S.Ct. at 3097, n.6.

**4.** The Ninth Circuit's measure of standard police inventorying procedures is somewhat more strict than that of the Fifth Circuit. *Compare United States v. Prescott,* 599 F.2d 103 (5th Cir. 1979) *with United States v. Hellman,* 556 F.2d 442 (9th Cir. 1977). The evidence in this case would nevertheless meet the more stringent test, enunciated in *Hellman,* that the police prove that inventorying is a routine practice of the locality which engaged in the inventory search. Though the government could not present evidence of a written policy statement concerning inventorying at the scene of an accident, HQ Special Order 31A shows clearly that inventorying *is* a standard practice among the Connecticut State Police, and Fragoso's testimony established the responsibility which the police assume for the property of those injured in an accident.

from claims of lost or stolen property, and protection of the police and the public from potential danger—apply with equal force whenever the police take possession of property, whether that property is "found" property, property in a seized vehicle, or property distributed about the scene of an accident. Regardless of the failure of the government to produce a written police order covering this particular situation, the State Police have some duty to accident victims to secure their property, especially when it is distributed over a wide area.

■ Moreover, only a minimal privacy interest was invaded in the gathering of Markland's property for inventory purposes. *United States v. Prescott, supra.* The articles collected by Fragoso were, for the most part, in "plain view" and therefore not subject to Fourth Amendment protection. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *United States v. Vallieres,* 443 F.Supp. 186 (D.Conn.1977). In balancing Markland's minimal privacy interest against the substantial public interest in protecting the property of accident victims, this court finds that Fragoso's collection of Markland's property was a reasonable exercise of a caretaking police function.

The trooper's failure to complete an inventory form listing the contents of the vehicle collected from the scene could, under other circumstances, negate the finding of a reasonable inventory search. *See United States v. Hall,* 565 F.2d 917 (5th Cir. 1978). Where, as here, the inventorying at most invades minimal privacy interests and the property is in the possession of the police for only a few hours, Fragoso's failure to complete the inventory form does not undermine the reasonableness of the police

intrusion into Fourth Amendment interests. *Id.*

## C

■ The opening of the closed plastic cooler involves different considerations from the mere collection of the scattered property. It presents the question left open by the Supreme Court in *Opperman* of whether police may inspect sealable containers in the course of a valid inventory search.[5] *See United States v. Ochs,* 595 F.2d 1247 (2d Cir. 1979); *United States v. Hill,* 458 F.Supp. 31 (D.D.C.1978). This court concludes that the expectation of privacy in this closed container more than outweighs the custodial interests enumerated by the Supreme Court in *Opperman,* making the opening of the plastic bag unreasonable and a violation of the Fourth Amendment.

■ The Supreme Court's approval of "inventory" searches of impounded automobiles was based on the dual considerations enumerated above: the diminished expectation of privacy in an automobile and its contents, and the interests of the caretaker-police in protecting themselves and the property owner. The opening of closed containers in the course of an *Opperman* search cannot be justified by these considerations. *United States v. Bloomfield,* 594 F.2d 1200 (8th Cir. 1979); *United States v. Hill, supra.* The owner of an opaque, closed container has exhibited an interest in privacy which the Fourth Amendment protects. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Reed,* 572 F.2d 412 (2d Cir. 1978). In the context of investigatory searches, the courts have consistently recognized the legitimacy of the expectation that closed containers will

---

**5.** The majority opinion in *South Dakota v. Opperman* makes no express mention of the propriety of opening sealable containers in the course of an inventory search. Mr. Justice Marshall's dissenting opinion, however, points out that "the Court's opinion does not authorize the inspection of suitcases, boxes, or other containers which might themselves be sealed, removed, and secured without further intru-

sion." 428 U.S. at 388, n.6, 96 S.Ct. at 3107 n.6. Mr. Justice Powell's crucial concurring opinion seems to support the inference that the opening of such containers cannot be sanctioned under *Opperman.* He notes that "[u]pholding searches of this type [inventory searches] provides no general license for the police to examine all the contents of such automobiles." 428 U.S. at 380, 96 S.Ct. at 3102.

not be searched without a warrant. *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979); *United States v. Vallieres*, 443 F.Supp. 186 (D.Conn.1977). *Chadwick, Sanders*, and *Dien* teach that the owner of a closed container does not forfeit this legitimate expectation of privacy merely by placing the container in an automobile. Therefore, the first consideration which supports the reasonableness of inventory searches, the owner's diminished expectation of privacy, does not apply to search of closed containers.

■ On the other hand, the custodial interests in protection of the owner's property and protection of the police from claims of lost or stolen property are fully served merely by inventorying "one closed container," where, as here, the package is closed securely and there is no danger of anything falling out of the bag. *United States v. Bloomfield, supra; United States v. Hill, supra.*

The third caretaker interest of the police, that they protect themselves from potential danger from the contents of a seized vehicle, when balanced against the substantial individual privacy interest, cannot support governmental intrusion in this case.[6] As the *Bloomfield* court pointed out:

> It is simply not reasonable to assume that, given the circumstances in which this knapsack was found, storing it as a unit at the police station, without specific knowledge of its contents, can pose a danger to police.

594 F.2d 1200, 1203. The plastic cooler posed an even less significant threat to safety than the knapsack in *Bloomfield.* In this case the state trooper knew that police possession of the bag would last but a few hours. Moreover, he could reasonably assume that the contents of the bag had safely withstood being thrown from the jeep at impact. The opening of Markland's plastic "Schlitz" bag, therefore, cannot be justified on the basis of protecting the police.

■ The conclusion that the opening of the plastic bag invaded the defendant's Fourth Amendment interest is limited to the facts of this case. It may be reasonable for the police to open closed containers pursuant to an inventory search where they have reason to believe they will find a dangerous instrumentality or condition, *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), or where the container is not securely closed, so that its contents might easily fall out. *United States v. Neumann*, 585 F.2d 355 (8th Cir. 1978).

The search of the contents of the plastic bag was unreasonable and violated Markland's Fourth Amendment rights. The evidence will be suppressed from use at trial.

## II

■ In view of this ruling that the plastic bag was illegally searched, this court will suppress all of defendant's statements as direct products of the illegal search.[7]

---

6. This is particularly true because this interest in protecting the police from danger in the contents of the automobile is the least significant of the police caretaking interests. As Mr. Justice Powell observed in *Opperman*, "[e]xcept in rare cases, there is little danger associated with impounding unsearched automobiles." 428 U.S. at 378, 96 S.Ct. at 3101. In this case, the government, resting heavily on this interest, argues that Fragoso had to open the cooler to protect against possible leakage of a beverage from a broken container in the bag. This "danger" is not of the type with which the Supreme Court was concerned when it identified the third caretaking interest in *Opperman*. See, e. g., *Cady v. Dombrowski*, 413 U.S. 433,

93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (police had reason to believe there was a gun in the car and they did not want vandals to steal it).

7. Markland's story of his own investigation into the losses could be suppressed on the independent ground that the statement was made in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendant made this statement in response to questioning by Postal Inspector Carroll just minutes after he expressed a desire to speak with an attorney before answering any questions. The *Miranda* court quite clearly stated: "[i]f the individual states that he wants an attorney, the interrogation

*Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Silverthorne Lumber Co., Inc. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). *Cf. United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). But for Fragoso's discovery of the stolen packages, it is obvious that defendant would not have been arrested or questioned, in view of the general practice in Connecticut of simply issuing infractions complaints for the offense of reckless driving. This holding suppressing all statements makes it unnecessary for the court to address defendant's argument that the statements should be suppressed as the product of a sham arrest.[8]

must cease until an attorney is present." 384 U.S. at 474, 86 S.Ct. at 1628. Although courts are divided over whether this states a *per se* rule against questioning once a defendant asserts the right to counsel, most courts would agree with this court's determination that the defendant's rights are violated when questioning resumes so soon after an assertion of the right to counsel, without new *Miranda* warnings and without any indication (other than an answer) from the defendant that he has waived his initial exercise of rights. *White v. Finkbeiner,* 611 F.2d 186 (7th Cir. 1979); *United States v. Rodriguez-Gastelum,* 569 F.2d 482 (9th Cir. 1978) (en banc). *But cf. People v. Cunningham,* 49 N.Y.2d 203, 424 N.Y.S.2d 421, 400 N.E.2d 360 (1980).

8. These statements cannot be used for any purpose at trial. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) permits the use of suppressed statements to impeach the defendant only where such statements are made in violation of defendant's *Miranda* rights and are otherwise trustworthy. Markland's statements, as fruit of the poisonous tree, are excludable for all purposes.