STATE OF NEBRASKA, APPELLEE, V.
JERRY G. OHLER, APPELLANT.

305 N.W.2d 637

Filed May 8, 1981. No. 43375.

Anthony S. Troia and Alan J. Crivaro of Troia Law
Offices, P.C., for appellant.

Paul L. Douglas, Attorney General, and Linda A.
Akers for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN,
BRODKEY, WHITE, and HASTINGS, JJ.

PER CURIAM.

The defendant, Jerry G. Ohler, was convicted by a
York County District Court jury of a violation of Neb.
Rev. Stat. § 28-508(1) (Reissue 1979), possession of
burglary tools, a felony, and of a violation of Neb. Rev.
Stat. § 28-511(1) (Reissue 1979), possession of stolen
property, a misdemeanor. Ohler further was found to be
an habitual criminal pursuant to Neb. Rev. Stat.
§ 29-2221 (Reissue 1979). He was fined $500 for the
misdemeanor and was sentenced to a term of 15 years in

the Nebraska Penal and Correctional Complex for the felony. Defendant's motion for a new trial alleged that the verdict was not sustained by the evidence, was contrary to law, and that there were irregularities in the proceedings preventing him from having a fair trial. In this court he assigns as error the action of the trial court in overruling his motion to suppress evidence seized as the result of a warrantless search and in overruling his motion for a new trial. In his brief, Ohler argues only the overruling of his motion to suppress. He makes no claim that the evidence, if properly admitted, did not sustain his conviction. We affirm.

The defendant was arrested on May 3, 1979, in a common areaway or alley located behind several business establishments in York, Nebraska. Ohler had entered several of the businesses through the rear door service entry and made contact with several proprietors and employees. One proprietor testified that Ohler had inquired whether the U.P.S. man had been there; another proprietor testified that Ohler told her that he had just come by to say "hello" and, after some conversation, he said he was looking for a lady with a little child. After the conversation about the U.P.S. man, the proprietor of the drugstore became suspicious and called the police department.

Police Sergeant Ronald Dickerson received the call which described the defendant, and he went to the area where he saw a man matching that description walking toward him in the alley, carrying a cardboard box under his arm. Sergeant Dickerson identified himself and then asked the man for identification. The man put his box down onto the ground and presented the officer with a card identifying himself as Jerry G. Ohler. Shortly thereafter, the chief of police, Franklin D. Valentine, arrived on the scene and, after some conversation, told Ohler that some incidents had occurred 1 to 3 months earlier in which a man had been going around asking the same questions which Ohler had asked on this date and that Ohler matched the description of that

individual. Valentine then told Ohler that, due to the circumstances, he would like Ohler to accompany them down to the police department to check it out further, and Ohler agreed to accompany the officers.

Sergeant Dickerson then asked Ohler what was in the box that he had placed on the ground. Dickerson testified at the preliminary hearing as follows: "Q. And what if anything did he tell you. A. He didn't tell me anything and I opened the --- Q. He didn't make any response at all when you asked him what was in the box. A. Well, he didn't tell me what was in the box he just said it was something, that he had found the box up the alley. Q. And what was -- what happened next. A. Well, I asked him if he had any objections if we looked in the box to see what he had. He was coming out from a store. Q. What was his response? A. Well, as far as I remember *he said that he didn't make any objections.*" (Emphasis supplied.)

The sergeant then opened the box and inside saw two pairs of men's boots which appeared to be new. Ohler was asked if he had a sales slip for the merchandise. The reply was in the negative, and Ohler further explained that he had found the boots near a trash receptacle down the alley. He then took the officers down to where he purportedly found the boots. At that time the officers placed the defendant under arrest for possession of stolen property or theft by unlawful taking. Ohler was patted down for weapons and when he opened his jacket the officer found a spatula with a wooden handle tucked into the waist of his pants. It was bent and had some zigzag marks on it.

Following the arrest, defendant was taken to police headquarters and his automobile was impounded. A search warrant was secured for a search of the car, based on an affidavit of Police Officer Michael Rathje. The affidavit set forth information regarding incidents which occurred in January of 1979 involving a burglary of the Sugar Plum Tree store of a sack of cash and checks. Another incident involved a burglary in an

apartment in the city of York of a large amount of jewelry. The affidavit stated that a man suspected of committing both acts matched the description of a man who had been entering a number of businesses in downtown York in January asking questions and using the same excuses for entering the rear of the store as did the man whom the police had in custody for possession of the stolen boots. The warrant was to search Ohler's car for a black knee-length coat worn by the man in January, one briefcase, and the jewelry stolen from the apartment.

The search uncovered such items as bent and scratched knives, skeleton keys, penlight flashlights, a screwdriver, a sledge hammer, and a steel punch. At trial, experts testified that these items could be and frequently were used as burglary tools.

After the preliminary hearing and prior to trial, Ohler's attorney filed a motion in limine and a motion to suppress all evidence held by the State, alleging that the evidence was obtained by an illegal search and seizure of defendant's person and vehicle. The motion recited that the search was made before defendant was placed under arrest; that the search was made without the consent of defendant; that no probable cause existed for the search, seizure, and arrest; and that defendant has standing to complain that the search was illegal. By stipulation of the parties the search warrant and affidavit and the transcript of the preliminary hearing were admitted as evidence on the motions. No further evidence was adduced at the hearing. We further note that the defendant not only did not testify at the preliminary hearing nor at trial, but neither was any other evidence presented by the defense to contradict the State's witnesses.

The trial court overruled the motion to suppress and the defendant has assigned that action as error. We note initially that there were two separate searches and seizures to which the motion to suppress applies. The first search was of the defendant's box and person in

which the police seized two pairs of boots and the spatula with the wooden handle. The second search and seizure was of the defendant's automobile in which police seized the burglary tools. If, as the defendant contends, the initial search and seizure and arrest were illegal, it is possible that the second search and seizure, although pursuant to a warrant, could be tainted as fruit of the poisonous tree.

We must determine whether the disputed search and seizure infringed an interest of the defendant which the fourth amendment was designed to protect. *Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). "The interest protected was defined by *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), where the Supreme Court held that the capacity to claim the protection of the fourth amendment depends not upon a property right in the invaded place, but upon whether the person who claims the protection of the amendment has a legitimate expectation of privacy in the invaded place." *State v. Vicars*, 207 Neb. 325, 329, 299 N.W.2d 421, 425 (1980). The question we must answer is whether governmental officials violated any legitimate expectation of privacy held by the defendant. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980).

The evidence reveals that the defendant consented to the search of the cardboard box. The defendant cannot assert any expectation of privacy in an area in which he gave governmental officials the permission to inspect. "Whether or not consent to search was freely and intelligently given is a question of fact to be determined from the totality of all the circumstances surrounding it." *State v. French*, 203 Neb. 435, 439, 279 N.W.2d 116, 119 (1979). The State presented evidence that the defendant consented to the search of the box. The defendant did not contradict that testimony, either directly or indirectly, nor was it challenged as being involuntary or coerced. We believe that the State has met its burden.

Since we have determined that the search of the box and seizure of the boots were lawful, the subsequent arrest of the defendant was based upon probable cause and therefore legal. There was no "poisonous tree" to taint the search, pursuant to warrant, of the defendant's car and the seizure of the burglary tools. The trial court was correct in overruling the motion to suppress the evidence.

The lawful owner of the boots identified them as having come from her store, and she further testified that she had not given permission to the defendant to have them in his possession. The tools taken from defendant's car were described by expert testimony to be burglary tools. This evidence was clearly sufficient to support the jury's verdict of guilty as to both crimes. This court will not interfere with a conviction based upon evidence unless it is so lacking in probative force that as a matter of law it can be said that it is insufficient to support a verdict of guilt beyond a reasonable doubt. *State v. Booth*, 202 Neb. 692, 276 N.W.2d 673 (1979).

The judgment and sentence of the District Court were correct and are affirmed.

AFFIRMED.

BRODKEY, J., concurring in result.

While I concur in the result reached by the majority of the court, I must strongly disagree with the grounds upon which the majority opinion is based, to wit, that the search by the police of the unsealed and partially opened cardboard box carried by the defendant and placed by him upon the ground prior to the search was a valid "consent search" pursuant to the voluntary and uncoerced consent and permission of the defendant. Of the various available grounds for affirming the conviction of the defendant in this case, the one selected by the majority of the court is, in my opinion, by far the weakest, and not sustained by the record. There are, however, several other valid grounds not mentioned or referred to in the majority opinion upon which de-

fendant's conviction can and should be sustained, as hereinafter discussed.

The sole and only basis for the conclusion of the majority that the defendant gave his consent to a search of the box is the following testimony of Officer Dickerson given at the preliminary hearing in this matter, as follows: "Q. And what was -- what happened next. A. Well, I asked him if he had any objections if we looked in the box to see what he had. He was coming out from a store. Q. What was his response? A. Well, *as far as I remember* he said that he didn't make any objections." (Emphasis supplied.) It should be noted, however, that when Officer Dickerson testified at the trial regarding the incident, he made no mention of the foregoing alleged consent to search, but only testified that he had asked the defendant what was in the box, but that the defendant did not tell him, and also that the box was partially opened and "we looked inside." He was then asked: "Do you remember testifying back at the Preliminary Hearing, don't you, in this matter? A. Yes, sir. Q. And I believe that on approximately page fifty-three of the Preliminary Hearing testimony, I believe the question was asked, 'What, if anything, did he tell you?' This is after you had stopped him. Then you stated in response, 'He didn't tell me anything and I opened the --' Then you just stopped and the question came back. 'He didn't make any response at all when you asked him what was in the box? Answer: Well, he didn't tell me what was in the box, he just said it was something.'" Officer Dickerson also testified that he was in uniform at that time. Chief of Police Valentine of York, Nebraska, who was also present at the time of the questioning, testified at the trial with reference to the defendant Ohler as follows: "I asked him if that was his box and he stated it was, and at that time, there was another sergeant present, which was *Sergeant Leach* and he opened the box up and it had two pair of boots in it." (Emphasis supplied.)

Even assuming, however, that it was Officer

Dickerson who had the conversation with the defendant immediately prior to the time that he searched the cardboard box, it is clear from the foregoing testimony that the officer, who was in uniform, did not directly and positively testify that the defendant had given him his consent to search the box, but merely testified that "as far as he could remember" the defendant did not make any objections.

"Consent to search is not to be lightly inferred, but should be shown by clear and convincing evidence, and any consent must be voluntary and uncoerced, either physically or psychologically. The government has the burden of proving the alleged consent. And it has been said that courts do not look with favor on the practice of substituting consent for the authorization of a search warrant." 68 Am. Jur. 2d *Searches and Seizures* § 46 at 699 (1973). It is the general rule that "when statements of accused clearly indicate that the search or seizure is made with his voluntary consent he will be held to have waived his rights under the guaranty. Where, however, the surrounding circumstances show that they were not voluntarily made, the courts have generally regarded statements which ostensibly indicated invitation or consent to search as being involuntarily made, and hence not constituting consent or waiver." 79 C.J.S. *Searches and Seizures* § 62 at 821-22 (1952). See, also, note 89 at 822 of the above citation, where particular statements are set out which have been held by the courts not to constitute waiver or consent.

The case of *State v. French*, 203 Neb. 435, 279 N.W.2d 116 (1979), cited in the majority opinion for the proposition that whether or not consent to search was freely and intelligently given is a question of fact to be determined from the totality of all the circumstances surrounding it, is actually and factually more in support of the position of the defendant with reference to his alleged consent to search than it is authority for the State. That case involved the search of the house of the

defendant by two deputy sheriffs, Earhart and Anderson. While Deputy Earhart led the defendant into the open and handcuffed him and put him in the police car, the defendant heard Deputy Anderson break open the kitchen door. While the defendant was sitting in the police car handcuffed he was asked for permission to go into the house, although no purpose for such entry was suggested. The defendant responded: "'Well, yeah. It won't make any difference anyway.'" In its opinion the court stated at 440, 279 N.W.2d at 119: "Even if Deputy Earhart might have believed, at that point, that the defendant had given voluntary, knowing, and intelligent consent to enter the house, Earhart discovered very shortly thereafter that Deputy Anderson had already broken into the house without any authorization whatever. Deputy Earhart was sufficiently uncertain about the consent situation, in view of the circumstances, that he returned to the defendant and said: 'You would have given us consent anyway, wouldn't you?' The defendant answered: 'No.' Earhart confirmed that answer on cross-examination." In that opinion we stated at 441, 279 N.W.2d at 120: "It was neither reasonable nor justifiable for them to conclude that they had the voluntary and intelligent consent of the defendant to make a search. The search was unreasonable. The motion to suppress should have been granted." In this case, notwithstanding the fact that the trial court apparently found that the defendant, by the single ambiguous statement set out above, had consented to the search of the box in question, I believe that the evidence introduced was clearly not sufficient to establish by clear and convincing evidence that the defendant intended to waive his constitutional immunity to an illegal search and seizure.

However, even assuming arguendo that this court could conclude from the foregoing evidence, without straining its credulity, that the foregoing ambiguous statement allegedly made by the defendant was sufficient to constitute a consent to search the cardboard

box, I am of the opinion that the majority of this court might better and should have based its opinion on other and stronger existing grounds, primarily that the defendant's fourth amendment rights were not violated for the reason that he did not have a legitimate expectation of privacy in the unsealed, partially opened cardboard box. The law is now well settled, and is so recognized in the majority opinion, that the capacity to claim the protection of the fourth amendment depends not upon a property right in the invaded place, but upon whether the person who claims the protection of the amendment has a legitimate expectation of privacy in the invaded place. See, *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); *Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); Case Note, 13 Creighton L. Rev. 653 (1979); Case Note, 58 Neb. L. Rev. 1123 (1979). On June 25, 1980, the Supreme Court of the United States in *United States v. Salvucci*, 448 U.S. 83, 100 S. Ct. 2547, 65 L. Ed. 2d 619, expressly overruled the case of *Jones v. United States*, 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960), which case had held that defendants charged with crimes of possession were entitled to claim "automatic standing" to challenge the legality of the search which produced the evidence against them, without regard to whether the defendants had an expectation of privacy in the area or premises searched or the property seized. In *Salvucci*, the Supreme Court held, *inter alia*, that defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own fourth amendment rights have been violated. In *Rawlings v. Kentucky*, 448 U.S. 98, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980), a case announced the same day as *Salvucci*, the court held that a defendant charged with the crime of possession has the burden of proof in establishing that he has a legitimate expectation of privacy in the area searched or the article seized. It is clear from the existing authorities that the defendant did not sustain his burden of proof that he had a legitimate expectation of privacy in the cardboard box

which was searched and the articles contained therein which were seized by the York city police. The courts have differentiated between various types of containers which are entitled to an "expectation of privacy," regardless of their location or the right to possess them. In *United States v. Chadwick*, 433 U.S. 1, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977), the court noted that "luggage is intended as a repository of personal effects," and that the defendants, by placing their property in a locked footlocker, "manifested an expectation that the contents would remain free from public examination." Later, in *Arkansas v. Sanders*, 442 U.S. 753, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979), the court stated that certain containers such as luggage, suitcases, or footlockers were "inevitably associated with the expectation of privacy," and because of their recognition in society as a repository for personal effects, their presence in a car or having fallen into public hands does not alter the reasonableness of an expectation that they will not be opened by the police. The court also held in that case that not all containers, packages, or parcels deserve the full protection of the fourth amendment, and differentiated their fourth amendment treatment from that associated with personal luggage. An excellent and exhaustive review of the cases differentiating the types of containers which will be afforded the protection of the fourth amendment against unreasonable searches and seizures and indicating the types to which the "expectation of privacy" standard will apply is found in the recent case of *People v. Maldonado*, 76 App. Div. 2d 691, 431 N.Y.S.2d 580 (1980). With reference to the type of container involved in the instant case, the court in *Maldonado* had the following to say at 696, 431 N.Y.S.2d at 583:

"More troublesome are cases which involve searches of containers which are neither luggage nor have any of the attributes thereof. The courts, with the notable exception of the California Supreme Court in *People v Dalton* (24 Cal 3d 850, cert den *sub nom. California*

*v Dalton*, 445 US 946 [wherein the warrantless search of a large metal box and a 'Longine' box was deemed to be unlawful]), have generally upheld searches of unsecured boxes (*United States v Neumann*, 585 F2d 355; *State v Kahlon*, 172 NJ Super 331), paper bags (*United States v Ross*, __F2d__ [DC Cir, TAMM, J., April 17, 1980]; *United States v Vento*, 533 F2d 838; *Clark v State*, 574 P2d 1261 [Alaska]; *Webb v State*, *supra* [dictum]), and other receptacles such as: plastic bags (*United States v Gooch*, 603 F2d 122; *Flynn v State*, 374 So 2d 1041 [Fla]), a closed but unlocked toolbox (*Wyss v State*, 262 Ark 502), a covered paper cup *People v Diaz*, 101 Cal App 3d 440) and an ice chest (*State v Heberly*, 120 Ariz 541).

"On the other hand, several courts have invalidated searches of nonluggage type containers which are locked (*People v Dalton, supra* [metal box]), zippered (*People v Belton*, 50 NY2d 447 [zippered pockets of a jacket found in a car during a warrantless search of the vehicle]; *United States v Markland*, 489 F Supp 932 [an insulated bag]), taped (*United States v Dien*, 609 F2d 1038 [cardboard box]; *People v Spencer*, 74 AD2d 77 [cardboard box]), or fastened shut (*People v Rinaldo*, 80 Ill App 3d 433 [large box with metal straps]).

Among the cases cited in *Maldonado, supra,* is *United States v. Neumann*, 588 F.2d 355 (8th Cir. 1978), in which the court considered a warrantless search of a department store box and stated at 360-61: "This court is of the opinion that the warrant requirement in *Chadwick* should not be extended to the facts of this case. There is simply an insufficient expectation of privacy in an unsecured cardboard box sitting in plain view in the passenger compartment of an automobile. The arresting officers merely lifted the lid of the box and discovered a large quantity of pills." The court in *Maldonado* also stated at 700, 431 N.W.S.2d at 585: "While a box of this sort is commonly used to transport

recently purchased clothing, it is hardly comparable to personal luggage which securely encases varied articles of a personal nature. Like the department store box in *Neumann*, the 'Ripley Howard' box was discovered in plain view on the floor of the automobile, and could be opened by merely lifting a lid."

We note in passing, however, that if the defendant in this case would have sealed the cardboard box, or would have securely tied or fastened it in some manner, thereby manifesting a special expectation of privacy, the search by the police would have required the issuance of a search warrant under the law above quoted.

I also think that the majority opinion in this case might well have found that the search in question was one incident to an arrest, notwithstanding the fact that the defendant was arrested after the search was accomplished. The fact is, however, that the arrest was almost contemporaneous with, and immediately followed, the search of the box and the "pat down" of the defendant in which a spatula was discovered on his person. In *Rawlings v. Kentucky*, 448 U.S. 98, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980), the U.S. Supreme Court stated at 111: "Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vise versa."

Finally, I point out that the actual search of the defendant's car, during which the burglary tools were discovered, was done pursuant to a validly issued search warrant. While it conceivably may be argued that this violated the "fruits of the poisonous tree" doctrine, this is entirely conjectural, and I am far from convinced that it did. If it be concluded that a search, and the resulting evidence recovered in such search, was valid and did not constitute the "fruits of the poisonous tree," then such evidence would clearly be sufficient in itself to sustain the conviction of the defendant.

For all of the above stated reasons, I can only concur in the result reached by the majority of this court in its opinion, and strongly believe that the opinion should have been based upon other grounds than it was.