372 So.2d 394 (1979)
Kenneth Victor CORY
v.
STATE.
8 Div. 153.
Court of Criminal Appeals of Alabama.
May 22, 1979.
Rehearing Denied June 26, 1979.
*395 Larry Edwin Perry, Huntsville, for appellant.
Charles A. Graddick, Atty. Gen. and David W. Clark, Asst. Atty. Gen. for the State, appellee.
DeCARLO, Judge.
Appellant was charged with robbery by a Madison County Grand Jury, but prior to trial he was committed to Bryce State Hospital at Tuscaloosa, Alabama. On May 18, 1978, he was determined to be competent to stand trial and was returned to Madison County.
On August 29, 1978, the appellant was tried before a jury, and on August 30, 1978, he was found guilty and sentenced to ten years imprisonment. On that date, he gave notice of appeal and, after a motion for a new trial was overruled, the case was appealed to this court for review. Appellant was determined to be an indigent for the purpose of this appeal.
The facts presented at trial are substantially as follows:
Charles Lifer was the lone operator of a U-Totem store in Huntsville, Alabama, on November 20, 1977. At approximately 10:30 or 10:45 P.M., a male, whom he identified as the appellant at trial, came into the store. According to Mr. Lifer, the man purchased "two pieces of gum" and, when the store operator "rang up four cents," the appellant "started to grin, reached in his back pocket and pulled out a gun." Mr. Lifer described the gun as "shiny, like chrome or nickel, and it was real small, and the tip of it just barely showed up, sort of to the side underneath his coat." Mr. Lifer said he could not see part of the weapon, "but from the tip, it looked real small, I would have thought it would be an automatic."
The store clerk stated that, at that time, the appellant said, "Give me the money," and, when he opened the register, the appellant said, "Make it fast." Mr. Lifer placed the money on the counter and the appellant picked it up. The appellant stopped to look out the front door and, after a car had passed, went out.
Mr. Lifer testified that, after the appellant left, he ran out of the store and "looked out to see if they were out there, but I couldn't see anything in front of the store." According to the witness, he "couldn't see anybody anywhere, it was real dark." Mr. Lifer stated that he then returned to the store and called the police.
Mr. Lifer also testified that he viewed a lineup at the Huntsville City Jail in late December. He stated that, at that time, he identified the appellant as the person who had robbed him on November 20, 1977, and also stated that no one had indicated to him which one of the six men he was viewing was the suspect. Mr. Lifer stated that he identified the appellant when he "first walked in" to view the lineup.
*396 During cross-examination, Mr. Lifer said that the main reason for his identification of the appellant was the "basic shape of his head." The witness stated, "I guess I just felt when I saw him, right away I just remembered everything from back then."
Regarding the gun used in the robbery, Mr. Lifer admitted, on cross-examination, that there was a possibility that more than one gun of the type he had identified existed. Further, even though Mr. Lifer stated that he could not definitely tell what type of material the appellant's coat was made of, or whether it was unbuttoned, he said "when I [saw] the coatlike I saw the guy, it just came back to me what it looked like." Mr. Lifer said that he did not observe the appellant leave in any type of vehicle.
Huntsville Police Officer, Daniel R. Dilacausey, Jr., testified that, on December 26, 1977, he saw the appellant "driving a white Dodge Van, '73 model, with a black stripe around it." Officer Dilacausey explained that he had received a "radio traffic that a van fitting this description which had been used in an armed robbery that had happened on the previous date was in the area." He then proceeded to that location where he saw the van and "stopped it at South Park Drive, and South Parkway."
In court, the officer identified the driver of the van which he stopped, as the appellant.
Officer Dilacausey stated that he asked the appellant for his driver's license and, at the same time, asked him to come to the squad car. At that point, there was "radio traffic in the presence of the [appellant] asking about certain weight, height, description of the armed robber, which fit very closely to the person [appellant] I had beside me."
The officer stated that he then asked the radio dispatcher what kind of weapon was used in the robbery. The dispatcher responded, in the appellant's presence, that it was a "small caliber automatic nickel or chrome plated" weapon.
At that point, the appellant advised him that he had "by the way, a gun under the front of may van, but it's not an automatic." The officer then asked, "do you mind if I go up and get the gun?" The appellant responded, "No, sir, I don't."
Officer Dilacausey retrieved the weapon and found that it was a loaded ".25 automatic Guardian pistol that was nickel plated." According to the police officer, the appellant said, "`well maybe it is,' or something to that effect," agreeing with him that it was an automatic.
Further, Officer Dilacausey testified that, when the appellant was unable to show a permit to carry the pistol, he was arrested for violation of the State Uniform Firearms Act and taken to the detective division of the Huntsville Police Department.
During cross-examination, defense counsel asked Officer Dilacausey how he received the information concerning the van that the appellant was driving. Dilacausey answered that the information was from a call made on the night of the robbery, from "a lady in the neighborhood of the store" who had "called in immediately after the armed robbery...." He stated that he did not talk to the woman personally, but received the information through "radio traffic, standard police procedure, [which] came out over the radio and was put out as a possible vehicle in an armed robbery."
Further, during cross-examination, the officer said that, to the best of his recollection, when he stopped the appellant in his van, he advised the appellant that his van fit the description of a van that "we believed to have been used in an armed robbery." He stated that not only did the appellant fit the description of the person who had robbed the U-Totem store, but also that the gun fit the description of the gun used in the armed robbery.
Dilacausey went on to state that he had received the "radio traffic from an officer who was working a traffic accident," and who had seen the van, but was unable to leave his accident scene. Officer Dilacausey testified that he, therefore, located the van and stopped it.
*397 During further cross-examination, Officer Dilacausey stated that he had never seen another white Dodge van, with a black stripe around it. Further, he stated that he never questioned the appellant about the armed robbery, and said that the only comment about the robbery was made by the appellant, who told him, "`It couldn't have been me, I was at home,' or `I was not in the state at that time,' or something to that effect."
Patrick Dillaha, a homicide and robbery investigator with the Huntsville Police Department, testified that he investigated the robbery at the U-Totem store on November 20, 1977. According to Officer Dillaha, he went to the U-Totem store and talked with the victim, Charles Lifer. Officer Dillaha stated that he received a description of the offender from Mr. Lifer, and then left the store.
On December 26th, about 9:00 A.M., Officer Dillaha talked with the appellant, after advising him of his constitutional rights, but the appellant did not sign a waiver or give a written statement at that time. According to the officer, he informed the appellant that he was going to contact the victim of the robbery and then place him in a lineup along with other persons "for purposes of identification."
The lineup was conducted on December 26th and, at that time, the victim identified the appellant as the man who had robbed him. Officer Dillaha said that he then placed the appellant under arrest for the robbery of the U-Totem store.
During cross-examination, the officer testified that the victim had described the robber's clothing, and had stated that he had a light-colored mustache at the time he robbed the store.
Following this testimony, the State concluded its case and the appellant called twelve-year-old Helen Irene Bentley as his first defense witness.
This witness testified that the appellant was her uncle and that, on November 20, 1977, she was home watching television. She stated that the appellant came in about 10:00 P.M., and watched television with her in her room. She said that, after a movie ended at 10 o'clock, he remained until the news concluded and that she later saw him in his bed in the living room of the house. She stated that her room was near the front of the house and that she did not hear any sounds of a vehicle leaving her house that night.
Roberta Clemmons, the appellant's next-door neighbor, testified that, on November 20, 1977, she had gone to the appellant's house to view a television program, and that at that time, the appellant was at home. She said that she went home around 9 o'clock and that he was also there when she left.
Further, Mrs. Clemmons stated that the appellant did not have a mustache at that time and that she had never seen him with one.
The appellant, Kenneth Victor Cory, testified that, on November 20, 1977, he was living with his sister and his niece, and that he was home watching television until about 10:00 P.M. on that night. He stated that, after the television news program was over, he went to bed and did not leave the house. He said that he had never see Mr. Lifer before the lineup and denied robbing him.
Further, the appellant testified that, while returning from a Christmas party, he was stopped by the police and that, when he walked toward the police car, the officer told him "the reason why I stopped you is because your van was sighted in several different robberies." According to the appellant, he was sitting in the police car talking with the officer and, during the conversation, he told the officer, "Yes, I have a gun." The appellant said that the officer, at that point, went to the van and took the gun from beneath the driver's seat.
During cross-examination, the appellant stated that he had been in the U-Totem store prior to the robbery, and had continued to frequent it. He stated that it took about "ten minutes" to drive from where he lived to the U-Totem store.
*398 The appellant said that Mr. Lifer was mistaken in his identification of appellant as the robber.

I
Appellant contends that the trial court committed reversible error by allowing the State to place into evidence hearsay testimony of the arresting officer concerning the possible use of his vehicle in a robbery. The appellant argues that by permitting this testimony, the court allowed the jury to believe that a van fitting the description of the one he was driving when he was arrested had been used in the robbery of the U-Totem store on November 20, 1977.
Appellant insists that permitting the officer to testify to what he had heard over his police radio denied him the right to cross-examine the source of that information to determine its reliability and relevancy. Appellant therefore insists that he was prejudiced by this testimony.
The testimony in question was a result of direct examination by the State of the arresting officer. From the record, we find the following:
"Q. What if anything drew your attention to that white van?
"A. I received radio traffic that this van
"MR. PERRY: Your Honor, we object, hearsay evidence.
"THE COURT: Overruled.
"Q. Go ahead, sir.
"A. I received radio traffic that a van fitting this description which had been used in an armed robbery that had happened on a previous date was in the area, and I proceeded to that location where I saw the van and stopped it at South Park Drive and South Parkway."
During cross-examination by defense counsel, the following occurred:
"Q. You said you received information that this van, the one the defendant was driving when you arrested him, fit the description of the van that supposedly had been used in a robbery?
"A. That's correct.
"Q. How did you receive that information?
"A. The night of the armed robbery, a lady in the neighborhood of the store, in the housing project behind the store or in the general vicinity, called in immediately after the armed robbery happened.
"Q. Did you receive that over the phone from someone, or did you go talk to her personally?
"A. No, that was radio traffic, standard police procedure, and it came out over the radio and was put out as a possible vehicle in an armed robbery.
"MR. PERRY: I object to any testimony relating to a van used in the robbery, unless the prosecution can show a van was used. Mr. Lifer testified he didn't know how the person left.
"THE COURT: Overruled."
McCormick's treatise on evidence states:
"In criminal cases, the arresting or investigating officer will often explain his going to the scene of the crime or his interview with the defendant, or a search or seizure, by stating that he did so `upon information received' and this of course will not be objectionable as hearsay, but if he becomes more specific by repeating definite complaints of a particular crime by the accused, this is so likely to be misused by the jury as evidence of the fact asserted that it should be excluded as hearsay." E. Cleary, McCormack's Handbook on the Law of Evidence, Ch. 24, § 248 (2d ed. 1972). [Emphasis added.]
In addition, Wigmore on Evidence, gives the following interpretation of the hearsay rule in this instance:
"The theory of the hearsay rule (§ 1361 supra) is that, when a human utterance is offered as evidence of the truth of the fact asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand, subject to the test of cross-examination. If, therefore, an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, but without reference *399 to the truth of the matter asserted, the hearsay rule does not apply. The utterance is then merely not obnoxious to that rule. It may or may not be received, according as it has any relevancy in the case; but if it is not received, this is in no way due to the hearsay rule." VI Wigmore, Evidence § 1766 (Chadbourn rev. 1970).
Testimony is not inadmissible as hearsay evidence when it is not submitted to prove the truth of the matter asserted. Although it is, in truth and in fact, hearsay, it is not inadmissible as such. See State v. Trotter, 203 Kan. 31, 453 P.2d 93. The testimony of a witness is not hearsay when it is not admitted to prove the truth of the matter asserted. "`Whenever the assertion of any person, other than that of the witness himself in his present testimony, is offered to prove the truth of the matter asserted, the evidence so offered is hearsay. If offered for any other purpose, it is not hearsay.'" State v. Aaron, 29 N.C.App. 582, 225 S.Ed.2d 117; citing Stansbury's N.C. Evidence, Brandis Revision, § 138.
When an officer testifies to the details of a police dispatch overheard by him, merely to provide some explanation for his subsequent action in locating the accused, the details of the dispatch are admissible in evidence. The testimony of the details of the dispatch is not inadmissible as hearsay evidence when it is not offered to prove the truth of those details.
In the present case, the testimony of the officer concerning appellant's "van," was introduced, not to prove that the appellant was at the scene of the offense or had committed the robbery, but in order to show what the officer did in response to the radio dispatch, why he stopped the van, and why he later checked with the dispatcher for a description of the person who had committed the robbery.
In Wharton's Criminal Evidence, we find the following statement of the rule:
"An extrajudicial statement is inadmissible as hearsay only when offered as evidence of the truth of the matter to which it relates." II C. Torcia, Wharton's Criminal Evidence § 274 (13th ed. 1972).
In the present case, the testimony concerning the radio dispatch was used to explain the reason the arresting officer stopped and interviewed the appellant, and was not offered to prove the truth of the radio dispatch's contents. Therefore, it is our judgment that the testimony concerning the radio dispatch was not erroneously admitted.

II
In the case at bar, appellant did not make a motion to exclude the State's evidence, and, although he did make a motion for a new trial, the issue of the sufficiency of the evidence was not specifically raised therein. However, it is our judgment that the evidence presented was more than sufficient to present the question of appellant's guilt for the jury's determination, and that it was equally sufficient to support the resulting verdict.
We have searched the record and have found no error prejudicial to this appellant. It is our opinion that the judgment of conviction by the Madison Circuit Court should be affirmed.
AFFIRMED.
All the Judges concur.
TYSON, Judge, concurring,
I concur in the principal opinion in this cause as prepared by my brother, Judge DeCarlo.
I wish to point out that, in my opinion, under the facts as related by Huntsville Officer Daniel Dilacausey, this Court does not run afoul of the opinion of the Supreme Court of Alabama in Paschal v. State, 365 So.2d 681 (1978). In the instant case, clearly a sufficient description of the robber, the weapon used, and of the van itself, was given in the officer's testimony so that a sufficient predicate was laid as to the details of the police radio broadcast. Also, this information, as sent out in the radio dispatch, was "firsthand." (See principal opinion)
*400 Moreover, in light of all of this, in my judgment, the State clearly established probable cause, plus exigent circumstances for stopping and searching the vehicle. See Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); and Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973).