Johnny Paul Molina was convicted for trafficking in cocaine and sentenced to twenty years' imprisonment. Five issues are raised on this appeal from that conviction.
 I
Molina contends that the police did not have sufficient probable cause to stop and search the automobile in which he was riding as a passenger. In setting out the facts surrounding this issue, we have considered and reviewed the testimony presented at the hearing on the motion to suppress and at trial. Henry v. State, 468 So.2d 896, 899 (Ala.Cr.App. 1984), cert. denied, Ex parte Henry, 468 So.2d 902 (Ala. 1985).
Around noon on November 6, 1986, Mobile Police Officer James Waldrop was checking two hitchhickers on Highway I-10 when a "complete stranger" in a pickup truck came "flying up to [Waldrop] pretty fast and jumped out of his truck." The truck driver "ran" over to Officer Waldrop and handed him a grocery receipt bearing the handwritten license tag number 530X200 LA or 550X200 LA. There was testimony that the "second digit was scribbled and could be interpreted as either a five or a three."
The driver told Officer Waldrop that he had "just seen" two white males in a red Porsche convertible with the top down purchase a "big bag of marijuana" on the causeway. The driver told Waldrop the car had a Louisiana tag and had just passed the officer going west on I-10. The driver also told Waldrop that he could see through the bag which contained marijuana. Waldrop noticed that there was a woman and a small child in the truck and assumed that they were the driver's wife and child. After giving Officer Waldrop the information, the driver "just turned around and took off back to his truck" and left.
Waldrop notified the police dispatcher that a "citizen [had] advised him that a red convertible occupied by two white males was westbound on I-10 with that tag number *Page 703 
[530X200 LA], possibly in possession of narcotics."
Within "a minute's time," Mobile Police Officer William Noel and his partner, Sergeant John Sweet, spotted a red Corvette convertible bearing Louisiana tag number 550X200. These "plainclothes" officers were in an unmarked car with a "standard blue municipal tag," "a dash-mounted blue light and an electronic siren."
As the Corvette pulled alongside the officers' car, Noel "glanced over." Twice the driver of the Corvette, Francisco Yannini, turned and looked at Noel. As the Corvette passed and pulled away, Molina, the passenger, also turned and looked. A "marked unit" was requested to stop the Corvette, which "continued to speed up." Officers Noel and Sweet discussed the matter and "decided that the vehicle was trying to leave [them]." The officers "put the blue light and siren . . . on." The marked unit came up behind them and also turned its lights on. Officer Noel testified that the Corvette "at first did not want to pull over. It slowed down some, then we followed it for probably a distance close to a quarter of a mile and then [the Corvette] pulled over . . . and stopped." In a statement given to the police on the date of his arrest, the defendant stated that they "were traveling at a rate of 75 to 80 miles per hour, at which time they were stopped."
Noel and Sweet stopped their unmarked vehicle fifteen to twenty feet behind the Corvette. The marked police unit was behind them. Standing by his car, Noel, with his badge in one hand and his pistol in the other, identified himself as a police officer. Sergeant Sweet was also standing outside the unmarked police car with his weapon drawn, and he ordered the suspects to place their hands on the dashboard. The suspects did not immediately comply with this command.
Officer Noel testified, "the passenger was squirming around in the car. His hands were moving around. They [Yannini and Molina] were looking at each other and they — they just at the time looked like they didn't know whether they wanted to comply or not."
Noel testified that Yannini "turned and looked," and that both suspects appeared to be "very nervous." The officer also stated that "the driver turned and was looking at the passenger. The passenger was looking back. There was a lot of suspicious motion." Molina "kept turning and his arms were moving between his legs and around the seat area." Officer Noel testified that Molina's "activity in the car, the motion, led [him] to believe that there could have possibly been a weapon involved."
After Officer Noel repeated his instructions two or three times "with emphasis," the suspects obeyed and placed their hands on the dashboard. Yannini was ordered out of the Corvette, frisked for weapons, handcuffed, and placed in the back seat of the patrol car. This same procedure was repeated with Molina, who was placed in the back seat of a different patrol car.
Officer Noel testified that the suspects had been "detained" but were not under arrest. Officer Waldrop testified that when he arrived at the scene both suspects were "in custody" and "under arrest."
Mobile Police Officer Sheri Frederick arrived on the scene after the Corvette had been stopped. Officer Waldrop testified that when he arrived an officer was walking Molina to a squad car. Officer Daniel Wilhelm arrived after the suspects had been placed in patrol cars.
A small black leather bag was observed in open view on the floorboard of the driver's side of the Corvette. At trial, Officer Noel testified that Sergeant Sweet instructed Officer Frederick "to pick the bag up and check it for weapons." At trial, Officer Frederick testified that Sergeant Sweet asked her "to pick it up and see what was in it." At the hearing on the motion to suppress, she testified that "the bag was big enough to hold a weapon" and that she opened the bag "[t]o see if it contained a weapon." The bag contained $8,708 in currency, a plastic bag containing 10.9 grams of marijuana, and a plastic bag containing .56 grams of cocaine. *Page 704 
A brown leather carryall-type bag was discovered in the trunk. It contained a .38 caliber revolver, $8,800 in currency, and three wrapped packages of cocaine totaling 6.695 pounds.
In denying the motion to suppress, the trial judge stated:
 "I find and rule under the totality of the circumstances of the facts in this case there was both probable cause to stop and search. The basis of my opinion is simply to review how this occurred. An unknown and unidentified good citizen, with his wife and child in his vehicle, stops a patrolman on the interstate and advises the patrolman that he has witnessed an illegal act, i.e., a large bag of marijuana transaction which occurred on the Causeway Interstate. This citizen gave a description of the automobile, which was a red convertible with certain license plate numbers. No one can dispute that there is conflict in the testimony about the make of the car and the issued license plate numbers. The officer who was stopped said it was a red Porsche convertible with the top down with two white males occupying the car and gave the license plate number as it's shown on State's Exhibit Number 1. Another officer testified it was simply a red sports car and gave the correct license plate number to match that which he said he received over the police radio from the first officer in question. To say that a police officer should not be allowed to produce — excuse me, should not be allowed to proceed under this information, as I stated yesterday, defies common logic or, stated differently, common sense, and to buttress my opinion, in the case of Adams v. Williams, 407 U.S. 143 [92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)], it says and I quote: 'The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, it may be the essence of good police work to adopt an intermediate response,' and that's the end of that quote. This was done in this case and the citizen's tip was followed and some miles down the Interstate a red convertible, although it was a Corvette convertible, with the top down was spotted, justifying the police to believe the citizen's information was true and correct. Pulling the car over, the occupants, that is, the two white males in question, were told two or three times to put their hands on the dash, and after being told two or more times and then not complying or responding as directed by the police officers, the police officers, whether out of fear or mere suspicion, required the occupants to get out, at which time each was patted down and put in a separate marked car.
 "Without reciting all of the testimony of the officers, they were justified in their actions under U.S. v. Ross, 456 U.S. 798 [102 S.Ct. 2157, 72 L.Ed.2d 572] and Adams v. Williams, the citation I recited earlier. They certainly had probable cause to search."
Our review convinces us that the police were justified in their actions. The initial police stop of the Corvette was justified as an investigative stop under Terry v. Ohio,392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Terry
doctrine is applicable to the vehicle-stop situation. Adams v.Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). See United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568,84 L.Ed.2d 605 (1985); United States v. Hensley, 469 U.S. 221,105 S.Ct. 675, 83 L.Ed.2d 604 (1985); United States v. Cortez,449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).
An officer is not required to have probable cause to make aTerry-type stop.
 "Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances — the whole picture — must be taken into *Page 705 
account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Cortez, 449 U.S. at 41718, 101 S.Ct. at 695.
See also Ex parte Betterton, 527 So.2d 747 (Ala. 1988).
This particularized and objective basis for suspicion of criminal activity may be supplied by an informant.Williams, supra; W. LaFave, 3 Search and Seizure § 9.3(e) (2d ed. 1987).
In determining the existence of probable cause to arrest or search, "[t]he better and modern view . . . is that as a general proposition any person purporting to be a crime victim or witness may be presumed reliable, though the police must remain alert to the existence of any circumstances which would make that presumption inoperative in a particular case." 1 LaFave § 3.4(a) at 719. However, "courts should be cautious in accepting the assertion that one who apparently was present when narcotics were used or displayed is a presumptively reliable citizen-informer" unless it is shown "with particularity how a law-abiding individual happened to come upon such knowledge." 1 LaFave § 3.4(a) at 728. Although basis of knowledge is generally not a major problem in citizen-informer cases, in the situation in which "the person providing the information asserts that he has detected illegal drugs or narcotics of a certain type at a certain place, . . . some showing must be made that this person has the ability to recognize that substance through the senses he employed." 1 LaFave § 3.4(b) at 732. Here, although the informer-truck driver stated he had just seen the marijuana purchased, he provided no particularized account of how he came upon such knowledge and no reason or information how he identified the substance as marijuana. For these reasons, we find that the information obtained from the truck driver did not provide probable cause to stop the Corvette, arrest its occupants, and search the car. See Spann v. State, 494 So.2d 719 (Ala. 1986).
However, "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." On the contrary, Terry recognizes that "it may be the essence of good police work to adopt an intermediate response." Williams,407 U.S. at 145, 92 S.Ct. at 1921. Based on the truck driver's report, the police were justified in stopping and briefly detaining the occupants of the Corvette in order to obtain more information. Williams, id. The circumstances surrounding the fact that the truck driver personally confronted Officer Waldrop provided sufficient "indicia of reliability," Williams,407 U.S. at 147, 92 S.Ct. at 1924, to justify the stop of the Corvette.
A similar factual situation with regard to the initial stop in this case was presented in United States v.Sierra-Hernandez, 581 F.2d 760 (9th Cir.), cert. denied,439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978). The observations of that court are helpful in deciding the issue presented in this case under review.
 "Information from a citizen who confronts an officer in person to advise that a designated individual present on the scene is committing a specific crime should be given serious attention and great weight by the officer. Nevertheless, whether the information is sufficient to justify a stop must be evaluated with reference to the facts of each case, for there is no per se rule of reliability.
 "There is an important difference between this case and Adams v. Williams, in which the Supreme Court discussed the indicia of an informant's reliability necessary to support a valid stop based on his tip. Here, since the informant was not known to the officer and cannot be traced, the officer's testimony cannot be corroborated. But just as there is no per se rule establishing the reliability of a citizen's tip to justify a stop in every instance, so too there is no per se rule requiring an officer to obtain the identity of the informant before he acts. In evaluating the reasonableness of the officer's conduct in this case, we therefore must *Page 706 
consider both the circumstances in which the tip was made and the facts which would justify the officer in acting without knowing the citizen's identity or obtaining information for tracing him later." Sierra-Hernandez, 581 F.2d at 763 (footnote omitted).
In addition to the fact that the officer knew that the reported location of the offense "had been the site of previous criminal activity," id., the court found the presence of other "indicia of reliability."
 "The tip here was neither vague as to the time of the criminal activity, cf. United States v. DeVita, 526 F.2d 81, 83 (9th Cir. 1975) (informant told police that 'a Mr. DeVita would be transporting some type of narcotics, possibly to the Pittsburg area, sometime in the near future'), nor imprecise as to the kind of crime being committed, cf. id; Long v. District of Columbia, 152 U.S.App.D.C. 187, 195, 469 F.2d 927, 935 (1972) (Wright, J., concurring) (casting doubt on sufficiency of stop based only on store manager's claim that customer was acting 'suspicious'). The suspect was clearly indicated and his criminal actions were described with some particularity.
 "Moreover, although the informant did not identify himself by name, he would have been available for further questioning if the agent had judged the procedure appropriate. Unlike a person who makes an anonymous telephone call, this informant confronted the agent directly. By thus presenting himself to the agent and doing so while driving a car from which his identity might easily be traced, the informant was in a position to be held accountable for his intervention. The reliability of the information was thus increased.
 "Finally, there are reasons to support the agent's failure to converse further with the informant, to ask for his name, or to note the license of his car. The suspect was in a vehicle moving away from the agent when the tip came, and we can infer from the record that it was reasonable for the agent to use his time to radio for assistance and to set off in pursuit, rather than to question the informant. There is nothing in the record which should have caused the agent to doubt the reliability or good faith of the informant in tendering information." Id.
Here, the truck driver's tip was neither vague as to the time of the criminal activity nor imprecise as to the kind of crime being committed. The truck driver supplied the license number of the vehicle and where it could be located, 1 LaFave § 3.4(c) at 742. Under the facts of this case, the discrepancies in the tag number and make of the automobile are not of major significance.
 "It is fair to say that the fact that part of the description given the police does not fit is 'a negative factor in [the] assessment of the existence of probable cause,' but yet it would be inappropriate to assume probable cause cannot exist absent a full match-up of all parts of the description. The arresting officer must be allowed to take account of the possibility that the victim or witness has been in error with respect to part of the tendered description.
 "In assessing the likelihood that this is the reason for the discrepancy, what must be taken into account is the strength of the points of comparison which do match up and also whether the nature of those which did not match are such that an error could readily occur. . . . [I]t is rather easy to confuse similar models of cars, and thus the fact a different kind of a car was named should not be deemed to defeat the probable cause showing when several other descriptive factors concerning the car and its occupants match up." 1 LaFave 3.4(c) at 743-44 (footnote omitted).
See State v. Nelson, 129 Ariz. 582, 633 P.2d 391 (1981) (one letter of vehicle license different); Brinnon v. State,376 So.2d 769, 771 (Ala.Cr.App.), cert. denied, Ex parte Brinnon,376 So.2d 772 (Ala. 1979) (mistakes in number of occupants, color combination, and make of car).
Here, as in Sierra-Hernandez, 581 F.2d at 763, the truck driver-informant did not identify himself but presented himself personally to Officer Waldrop. His identity could have easily been obtained or traced *Page 707 
through the license tag of his truck. Additionally, Officer Waldrop's failure to obtain additional information is understandable. He was faced with the need for immediate responsive action upon being informed that the suspects had just passed him on an interstate highway.
We conclude that the police were justified in stopping the Corvette on the reasonable suspicion of criminal activity. That suspicion ripened into probable cause when the police observed evasive action and furtive gestures on the part of the Corvette's occupants. "Although the initial stop of the suspect may have been justified only by reasonable suspicion, additional facts gathered from that stop may strengthen that suspicion into probable cause." United States v. Martinez,808 F.2d 1050, 1055 (5th Cir.), cert. denied, 481 U.S. 1032,107 S.Ct. 1962, 95 L.Ed.2d 533 (1987). See Stanfield v. State,529 So.2d 1053 (Ala.Cr.App. 1988). See also State v. Booth,202 Neb. 692, 276 N.W.2d 673, cert. denied, Booth v. Nebraska,444 U.S. 982, 100 S.Ct. 485, 62 L.Ed.2d 409 (1973) (tip from citizen plus furtive gestures by suspect amounted to probable cause).
"[T]he 'furtive gesture rule' . . . had its genesis in Terry and was expanded upon in Sibron [v. New York, 392 U.S. 40,88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)], which provides that a furtive gesture when coupled with prior reliable information may constitute probable cause for search or arrest." State v.Booth, 202 Neb. at 698, 276 N.W.2d at 676 (citations omitted).
 "[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest." [Sibron and] Peters v. New York, 392 U.S. 40, 66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968).
In the present case, the Corvette proceeded a quarter of a mile before pulling over after being signalled to stop by a marked police car, see Bergeron v. Superior Court, 2 Cal.App.3d 433,82 Cal.Rptr. 711 (1969); the occupants did not immediately comply with a request to put their hands on the dashboard, seeState v. Bennett, 62 Haw. 59, 610 P.2d 502, 506 (1980); and they failed to comply until Officer Noel had repeated his instructions two or three times "with emphasis." See UnitedStates v. Taylor, 716 F.2d 701, 709 (9th Cir. 1983) (suspects failed to comply with order to raise their hands until officer repeated order several times). There was "a lot of suspicious motion" with the defendant "turning" and "moving [his arms] between his legs and around the seat area." See State v.Bennett, supra (one of suspects kept one hand "fiddling around" under the dashboard); State v. Munoz, 385 N.W.2d 373, 376
(Minn.Ct.App. 1986) (suspect was leaning over).
Based on the foregoing conduct, the officers could reasonably conclude that the occupants of the Corvette were attempting to conceal contraband, and they were therefore justified in arresting the defendant and his companion. The search of the passenger compartment of the automobile was then permissible as a "contemporaneous incident of that arrest," New York v.Belton, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768
(1981). Once contraband was found in the passenger compartment, there was probable cause to search the trunk under UnitedStates v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572
(1982).
 II
The defendant argues that the court erred in admitting a videotape of a telephone call he made while being "booked" at the Mobile City Jail. He claims that his telephone conversation was inadmissible under Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because the booking officers did not warn him that everything he said was being recorded and could be used against him. He also claims that the State did not establish a proper predicate for admission of the videotape. *Page 708 
 A.
Sergeant Joseph V. Connick, the Mobile police officer in charge of the docket room on the day that the defendant was arrested, testified that, as a matter of standard police procedure, the booking of every subject is videotaped. According to Sergeant Connick, the "primary reason for [the videotaping] is to protect the officers and insure that the events that occur in the docketing procedure, especially related to personal property, is accurately recorded." Sergeant Connick told the defendant that "everything [that] transpired in the docket room was being recorded," but he did not specifically tell the defendant that anything he said "could be used against [him] in a court of law."
The failure to inform the defendant that statements he made during his telephone conversation could be used against him does not render his statements inadmissible. The warnings outlined in Miranda were not required here because, although the defendant was in custody, he was not "interrogated."
 " '[B]efore the [Miranda] warnings need be given, it must be established that the subject was both "in custody" and under "interrogation" by police officers.' United States v. Castro, 723 F.2d 1527, 1530 (11th Cir. 1984). See Smith, 'The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation?' 25 S.C.L.Rev. 699, 702 (1974). Here the defendant was clearly in custody. However, not all 'statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation.' Rhode Island v. Innis, 446 U.S. 291, 299, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). The Supreme Court defined 'interrogation' in Miranda as 'questioning initiated by law enforcement officers,' 384 U.S. at 444, 86 S.Ct. at 1612, and pointed out that '[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.' 384 U.S. at 478, 86 S.Ct. at 1630. See generally, Annot. 31 A.L.R.3d 565 (1970). A volunteered statement, made without any attempt by peace officers to solicit it, is not deemed to be the product of custodial interrogation, even though an individual may be in the most severe form of custody. United States v. Littlejohn, 441 F.2d 26, 27-28 (10th Cir. 1971).
 " 'The mere existence of custody alone, however, does not necessarily give rise to . . . inherent psychological pressures. Thus, the "spontaneous" or "volunteered" confession of a suspect in custody is admissible despite the absence of prior Miranda warnings. As the Court stated in Innis, "[i]nterrogation," as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." ' United States v. Booth, 669 F.2d 1231, 1237, appeal after remand sub nom. United States v. Kessler, 692 F.2d 584 (9th Cir. 1981) (quoting Rhode Island v. Innis, 446 U.S. at 300, 100 S.Ct. at 1689) (citations omitted)." Whittle v. State, 518 So.2d 793, 797-98
(Ala.Cr.App. 1987).
Sergeant Connick testified that the video camera was located "over the docket desk" and two chest-high microphones were attached behind a wire-mesh screen in front of the counter. He stated that the cameras and microphones, as well as a nearby television monitor, were clearly visible to anyone being booked. When the defendant made his call, Sergeant Connick handed him the telephone receiver over the counter. At that point, the defendant was "right above" the microphones.
The practice of allowing the accused to make a telephone call in a docket room within earshot of police officers and in clear view of video and audio recording equipment is not the functional equivalent of police interrogation. See Arizona v.Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). InMauro, the defendant argued that he had been interrogated within the meaning of Rhode Island v. Innis, supra, when he was allowed, following his arrest for the murder of his son, to speak to his wife only in the presence of a police officer with a tape recorder. *Page 709 
Rejecting Mauro's argument, the Supreme Court noted that the police (1) asked him no questions, (2) were properly present for security reasons and not for the purpose of eliciting incriminating statements, and (3) did not allow the husband-wife meeting merely as a "kind of psychological ploy that could properly be treated as the functional equivalent of interrogation." 107 S.Ct. at 1935. Significantly, the Court found the following circumstance indicative of theabsence of any ploy: " '[t]he officer who was present produced a tape recorder and told the couple that their conversation would be recorded and put that tape recorder down on the desk in plain sight and taped their conversation, so they had knowledge that that was going on.' " 107 S.Ct. at 1935-36 n. 5. Finally, the Court observed that viewing the situation from Mauro's perspective made it clear that he was not interrogated.
In the present case, the defendant was also not subjected to direct questioning, psychological ploys, or compelling influences. The videotaping device had a legitimate security function unrelated to the purpose of eliciting incriminating statements. The fact that there was a "possibility" that the defendant would incriminate himself while talking on the telephone, and that the Mobile Police Department officials were "aware of that possibility" did not convert legitimate videotaping into "subtle compulsion." 107 S.Ct. at 1936. "Officers do not interrogate a suspect simply by hoping that he will incriminate himself." Id. The taping device was in plain sight of the defendant while he made his telephone call. Seealso Hardin v. State, 649 P.2d 799, 802 (Okla.Cr.App. 1982) (no attempt to conceal videotaping device). To paraphrase the Supreme Court, when viewing the situation from the defendant's perspective, "[w]e doubt that a suspect, told by officers that [he] will be allowed to [make a phone call] would feel that he was being coerced to incriminate himself in any way." 107 S.Ct. at 1936.
"Although the prosecution did not elicit any specific testimony that the conversation was voluntary, the very circumstances surrounding the conversation sufficiently demonstrate this portion of the predicate." Logue v. State,529 So.2d 1064 (Ala.Cr.App. 1988). "The defendant, with knowledge that the police were listening, could have chosen not to speak. . . . Instead, he chose to speak." Arizona v. Mauro, 107 S.Ct. at 1936 n. 5.
 B.
The defendant contends that the videotape was inadmissible because the witnesses called to authenticate it could not establish its accuracy or chain of custody.
In recent years we have required compliance with the seven-pronged test set out in Voudrie v. State, 387 So.2d 248,256 (Ala.Cr.App.), cert. denied, Ex parte Voudrie,387 So.2d 256 (Ala. 1980), for the admission of sound or film recordings. In addition, Alabama has always followed the traditional or "pictorial communication" theory for admitting photographs, maps, diagrams, sound recordings, movies, and videotapes. SeeUAW-CIO v. Russell, 264 Ala. 456, 470, 88 So.2d 175, 186
(1956), affirmed, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030
(1958). See generally E. Cleary, McCormick on Evidence § 214 (3d ed. 1984); W. Schroeder, J. Hoffman, and R. Thigpen,Alabama Evidence § 11-3 (1987); 3 Wigmore, Evidence §§ 790, 792 (Chadbourn rev. 1970). Under that theory, a videotape is the "nonverbal expression of the testimony of some witness
competent to speak to the facts represented." 3 Wigmore, supra, at 218-19 (emphasis in original). It "becomes admissible only when a witness has testified that it is a correct and accurate representation of relevant facts personally observed by the witness." McCormick on Evidence, supra, at 530.
 "The motion picture does not of itself prove an actual occurrence but the thing reproduced must be established by the testimony of witnesses. The motion picture as exhibited to the jury is the pictorial communication of the witness' testimony and is used to convey the observations of the witness to the jury more fully and accurately than the witness can convey them verbally. The picture is not admissible unless a witness testifies *Page 710 that the picture as exhibited accurately reproduces the objects or actions which he observed." UAW-CIO v. Russell, 264 Ala. at 470, 88 So.2d at 186
(emphasis added).
In the present case, Sergeant Connick, who testified to the operation and functional capability of the videotape machine, was unable to testify that the tape fairly and accurately reproduced the defendant's telephone conversation because he personally was not a witness to the conversation. Connick testified that he activated the videotaping device but that he later left the room and did not hear the defendant make the call. Under the traditional "pictorial communication" theory for admitting the videotape, Sergeant Connick was not a competent witness and could not have established the necessary predicate for its admission.
Under an alternative principle of admissibility known as the "silent witness" theory, however, Sergeant Connick's inability to state that the tape accurately portrayed what he personally perceived would not have rendered the tape inadmissible. See 3 Wigmore, § 790, supra.
 "[I]t has become clear that an additional theory of admissibility . . . is entitled to recognition. Thus, even though no human is capable of swearing that he personally perceived what a photograph [or videotape] purports to portray (so that it is not possible to satisfy the requirements of the 'pictorial testimony' rationale) there may nevertheless be good warrant for receiving the . . . evidence. Given an adequate foundation assuring the accuracy of the process producing it, the photograph [or videotape] should then be received as a so-called silent witness or as a witness which 'speaks for itself.' " 3 Wigmore, supra, at 220.
The "silent witness" theory of admissibility has been principally relied upon to admit X-ray photographs, see Peoplev. Bowley, 59 Cal.2d 855, 861, 31 Cal.Rptr. 471, 475,382 P.2d 591, 595 (1963) (collecting cases), and films taken by surveillance cameras when there were no humans present, see,e.g., United States v. Taylor, 530 F.2d 639 (5th Cir.), cert. denied, Taylor v. United States, 429 U.S. 845, 97 S.Ct. 127,50 L.Ed.2d 117 (1976) (film of bank robbery made by camera activated after bank personnel were locked in vault).
 "X-ray photographs are admitted into evidence although there is no one who can testify from direct observation inside the body that they accurately represent what they purport to show. . . .
 "There is no reason why a photograph or film, like an X-ray, may not, in a proper case, be probative in itself. To hold otherwise would illogically limit the use of a device whose memory is more accurate and reliable than that of a human witness." People v. Bowley, id.
The predicate for admission under the "silent witness" theory "differs markedly from that customarily permitted under the traditional doctrine." W. Schroeder, J. Hoffman and R. Thigpen,Alabama Evidence, supra, at 376. "It is neither possible nor wise to establish specific foundational requirements for the admissibility of photographic evidence under the 'silent witness' theory, since the context in which the photographic evidence was obtained and its intended use at trial will be different in virtually every case." Fisher v. State,7 Ark. App. 1, 643 S.W.2d 571, 575 (1982).
Although the traditional "chain of custody" predicate is not required under the "silent witness" theory, see, e.g., State v.Deering, 291 N.W.2d 38, 40-41 (Iowa 1980), if there are no available eyewitnesses to verify the accuracy of the recording at issue, then there should be some testimony which establishes "the fidelity of the film's portrayal," id. at 40. See e.g.,People v. Doggett, 83 Cal.App.2d 405, 188 P.2d 792, 795 (1948) (testimony by a photographic expert that the picture was not a composite and had not been faked, but was a true representation of a "pure negative"). State v. Molasky, 655 S.W.2d 663, 668
(Mo.App. 1983), cert. denied, 464 U.S. 1049, 104 S.Ct. 727,79 L.Ed.2d 187 (1984) (videotape expert verified that tape had not been altered). See generally Annot. 60 A.L.R.3d 333, 345-48 (1974). *Page 711 
 "As long as satisfactory evidence of the integrity of a film or videotape is presented, stringent foundational requirements, such as proof of a continuous chain of custody, are now almost universally rejected as unnecessary. An example of a film or tape for which chain of custody might be one appropriate way of establishing authenticity would be a film or tape made with an automatic camera that recorded an event when no human beings were present. But even in this situation, rather than resorting to proof of chain of custody, it usually should be possible to authenticate the film or tape in some other way, such as by the testimony of a photographic expert who has determined that it had not been altered in any way and was not built-up or faked." C. Scott, 3 Photographic Evidence § 1297 at 95 (2d ed. 1969) (1987 Pocket Part). See also State v. Young, 303 A.2d 113 (Me. 1973) (chain of custody proved in the absence of eyewitness verification); State v. Bunting, 187 N.J. Super. 506, 455 A.2d 531
(N.J.Super.Ct. 1983) (same).
In the present case, Sergeant Connick could not testify to the accuracy of the tape, the State presented no evidence relating to the chain of custody, and there was no expert testimony that the tape had not been altered. We hold, nevertheless, that the videotape was properly admitted under a streamlined version of the "pictorial communication" theory. We endorse in principle the "silent witness" theory and find its rationale relevant to our disposition of this issue. However, we rely on the traditional doctrine to uphold the admissibility of the tape because the testimony of another State's witness, Corporal Robert Sieck, Sr., provided a sufficient basis for authenticating the evidence under a revised version of the traditional predicate.
Corporal Sieck testified that he was physically present when the defendant made his telephone call, but he "really wasn't paying that much attention to what [the defendant] was saying." Sieck was busy tending to other work (including waiting on someone who came up to the booking desk) during the call, but he heard the defendant speaking and was aware of the general tenor of the conversation. He viewed the videotape prior to trial, and, although he could not state that he had any independent recollection prior to seeing the tape of all that the defendant said, he testified that the tape accurately portrayed the telephone call. Defense counsel questioned Sieck on voir dire in an attempt to discredit his ability to hear what he claimed to have heard. Sieck acknowledged that, "before I heard this tape this morning I could not testify specifically what the conversation was about." On redirect examination by the State, Sieck testified that his memory had been refreshed by viewing the tape and he determined that the tape was "accurate."
Corporal Sieck's testimony was sufficient to authenticate the tape. Although he could not verify every word that the defendant uttered as one he personally heard, when "portions of the tape's film and sound [are] verified by an eyewitness," the videotape is admissible. United States v.Bynum 567 F.2d 1167, 1177 (1st Cir. 1978) (emphasis added). Since the defendant made no argument that the tape was inaccurate or had been altered, Corporal Sieck's verification of the parts of the tape he heard was sufficient. See LouisVuitton, S.A. v. Spencer Handbags Corp., 765 F.2d 966, 974 (2d Cir. 1985).
As the Alabama Supreme Court observed in UAW-CIO v. Russell:
 "There is no doubt that motion pictures are subject to change and falsification, as is the testimony of any witness, but protection against falsification or misrepresentation lies in the requirement of preliminary proof that the picture is an accurate reproduction of the event which it depicts and in the opportunity for cross examination of the witness making such proof." 264 Ala. at 470, 88 So.2d at 186 (emphasis added).
Here, the cross-examination of Corporal Sieck pointed out any defects in his ability to see or hear the defendant's telephone call and affected the weight and credibility *Page 712 
of the videotape rather than its admissibility. UAW-CIO v.Russell, supra.
 " 'The sufficiency of the preliminary proof offered to show that the picture is an accurate reproduction of the things which it purports to portray, and whether the picture will aid or tend to confuse the jury, is committed to the sound discretion of the trial court which will not be reversed except for gross abuse.' C. Gamble, McElroy's Alabama Evidence § 123.06 (3rd ed. 1977)." Morgan v. State, 518 So.2d 186, 189
(Ala.Cr.App. 1987).
We adopt the "better reasoned rule" that "video recordings are admissible on the same basis as other types of photographic evidence, i.e. admissible when verified by some witness who can state that they are a reliable reproduction of the recorded picture and sound." C. Scott, Photographic Evidence, supra, § 1297 at 98 n. 42.20 (1987 Pocket Part).
 "The motion picture on a film or videotape is at least a partial verification of the reliability of the sound track because the picture usually enables the viewer to tell who is speaking and in some instances, gestures and other movements of the speakers may make indistinct words understandable." Scott at 95.
Accordingly, we reaffirm the predicate for admitting videotape evidence announced by our Supreme Court inUAW-CIO v. Russell, supra, and we specifically reject the dicta in Voudrie v. State, 387 So.2d at 256, and cases following it, that have upheld the more stringent seven-pronged predicate for admitting sound recordings. "[T]he stringent requirements sometimes made for the verification of sound tape recordings should not be applied to the audio portion of videotape recordings." C. Scott, Photographic Evidence, supra, at 95. The "seven-pronged test is now usually considered obsolete, even for sound recordings," id. at 98 n. 42.20, and "has been abandoned in the better reasoned cases in favor of a rule holding that sound tapes like photographs are admissible when a witness testifies they are reliable representations of the subject sound," id. at 97 n. 42.5.
The videotape was thus admissible without a showing of its chain of custody. "[A] proper foundation laid for the accuracy of what the film portrays obviates the need to establish a chain of custody to demonstrate its authenticity." State v.Deering, 291 N.W.2d 38, 41 (Iowa 1980). Accord, Mikus v. UnitedStates, 433 F.2d 719, 725-26 (2d Cir. 1970); Paramore v. State,229 So.2d 855, 859 (Fla. 1969), vacated on other grounds,408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972); Bremer v.State, 18 Md. App. 291, 307 A.2d 503, 535 (1973), cert. denied,415 U.S. 930, 94 S.Ct. 1440, 39 L.Ed.2d 488 (1974) (videotape of attempted assassination of Governor George Wallace admitted without proving chain of custody of the film).
 III
Following his arrest, the defendant made an oral statement to Sergeant Samuel Cochran. Cochran took handwritten notes and later reduced his notes to a typewritten report. At trial, Cochran testified to the oral statement made by the defendant and the court admitted the typewritten report into evidence as State's Exhibit 15. The defense was given a copy of the report prior to trial and used the report in cross-examining Sergeant Cochran.
The defendant now claims that Cochran testified at trial to the following additional statement made by the defendant which was not contained in the typewritten report, and of which he did not have pre-trial notice as required by Rule 18.1(a), A.R.Cr. P.(Temp):
 "Q [By District Attorney]: Did [the defendant] tell you whether or not he was to get any money for this trip?
 "A [By Sergeant Cochran]: I was sitting in on a conversation when I heard him relating to Corporal Wilhelm that he was to receive $2,000.00 for riding along or coming along.
 "[Defense Counsel]: Judge, I'm going to move to strike that. There is no showing as to when and where that statement was made. *Page 713 
"[District Attorney]: We can do that."
Rule 18.1(a)(2) requires the pre-trial disclosure to the defense of the "substance of any oral statements made by the defendant before or after arrest to any law enforcement officer . . . which the state intends to offer in evidence at the trial." Here, the defense was apparently not apprised of the foregoing portion of the defendant's oral statement to which Sergeant Cochran testified at trial. However, there was no objection on grounds of the State's noncompliance with the discovery provisions of Rule 18.1(a). The objection was addressed merely to the State's failure to show "when and where the statement was made." The State then made that showing. There was no further objection until State's Exhibit 15, the written report, was introduced, at which time the defendant argued, as he does on appeal, that he was entitled to disclosure of Sergeant Cochran's original handwritten notes. That objection was not well-taken since Rule 18.1(e) specifically exempts from discovery "memoranda . . . made by law enforcement agents, in connection with the investigation or prosecution of the case." The defendant is bound by the specific objection raised at trial, Reynolds v. State,484 So.2d 1171, 1173 (Ala.Cr.App. 1985), and waives on appeal all grounds not specified below. C. Gamble, McElroy's AlabamaEvidence § 426.01(11). "The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Exparte Frith, 526 So.2d 880 (Ala. 1987).
The defendant never requested that Sergeant Cochran'stestimony about the previously non-disclosed statement be excluded as a sanction for noncompliance with discovery rules. See Rule 18.5(a) (the court may "prohibit [a] party from introducing evidence not disclosed"). "The jurisdiction of the Court of Appeals is appellate only, and its review is limited to matters upon which action or ruling at nisi prius was invoked." Harris v. State, 347 So.2d 1363, 1367 (Ala.Cr.App.), cert. denied, 347 So.2d 1368 (Ala. 1977). "[I]t is axiomatic that the trial court may not be put in error in the absence of any attempt to invoke a ruling of the court in the matters complained of." Carter v. State, 30 Ala. App. 251, 253,4 So.2d 195 (1941). The defendant's objection to the document which had
been previously disclosed was properly overruled. Under the circumstances, there is no error preserved for our review.
 IV
The State presented sufficient proof of constructive possession. Although mere presence in an automobile containing drugs is insufficient to show knowledge of the presence of the contraband, Lott v. State, 456 So.2d 857, 860 (Ala.Cr.App. 1984), there were "additional circumstances" here from which defendant's knowledge of the presence of the cocaine could be inferred, see Hammins v. State, 439 So.2d 809, 810 (Ala.Cr.App. 1983).
Even though the defendant initially told the authorities that the car belonged to his roommate, he stated during a telephone call in the docket room at the city jail that the police had "his car." He unequivocally claimed ownership of over $8,000 in cash located in the automobile. He was unable to give a plausible explanation for carrying such a large sum of money. He stated that he was going to buy a car from a man named "Gerald," but he could not provide Gerald's last name, address, phone number, or place of employment. He was unable to "provide any information as to how he proposed to find this person named Gerald." In addition, he told the police that he was to receive "$2,000 for coming along" on the trip with Yannini from "some profits that Mr. Yannini was to make," but "[h]e refused to specify or stated that he was just — did not know what the profits were from."
These circumstances warrant the inference that he was aware of the presence of cocaine in the automobile, and present at least as strong a case of constructive possession — if not stronger — than that presented in Price v. State,531 So.2d 697 (Ala. 1988), wherein the Alabama Supreme Court, reversing this court's determination that the State had not proved Price's connection *Page 714 
with contraband in a residence, observed the following:
 "[T]he evidence showed that Price was found in a 'drug den.' He answered the door two minutes after the police knocked on it; he lied to the police by telling them that no one else was present in the house; and he had $5,000 on his person. We think that the jury could have reasonably inferred that Price was guilty of possession under these facts. The Court of Criminal Appeals took the view that the evidence could be reasonably explained under a theory consistent with Price's innocence. In so doing, the court substituted its decision for that of the jury. The jury, by finding Price guilty of the offense charged, was obviously satisfied that the evidence excluded every reasonable
hypothesis except that of guilt. It was the jury's call." 531 So.2d at 699 (emphasis in original).
 V
Mobile police officer William Noel was properly allowed to testify that he had been informed by a police radio dispatch that "a red sports car type vehicle . . . had been observed in some activity on the Causeway where suspected drugs had been placed in the vehicle." Noel's testimony was used to explain the reason he pursued and subsequently stopped the defendant. It was not offered to prove the truth of the contents of the dispatch and, thus, did not constitute hearsay. Dent v. State,423 So.2d 327, 328 (Ala.Cr.App. 1982); Cory v. State,372 So.2d 394, 399 (Ala.Cr.App. 1979); Crews v. State,375 So.2d 1291, 1294 (Ala.Cr.App. 1979).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.