Danny Ray Weddington was convicted of first-degree sexual abuse, first-degree sodomy, production of obscene matter, and possession of obscene matter. The convictions arose out of Weddington's videotaping himself engaging in sexual acts with the four-year-old daughter of his wife's best friend. The trial court sentenced him to consecutive terms of 10 years in prison on the convictions for first-degree sexual abuse and possession of obscene matter, and to life imprisonment on the convictions for first-degree sodomy and production of obscene matter. *Page 752 
The Court of Criminal Appeals affirmed the convictions in an unpublished memorandum. Weddington v. State (No. CR-00-1061, August 24, 2001) 837 So.2d 889 (Ala.Crim.App. 2001) (table). We reverse that court's judgment only insofar as it held that Weddington failed to preserve for appellate review his objections to the trial court's jury instructions on the count charging production of obscene matter. In all other respects, we affirm the Court of Criminal Appeals' judgment.
 Facts
In September 1998, Weddington's wife, Paula, while talking on the telephone with her best friend, T.V., was looking through her bedroom closet for a cancelled check when she found on the closet shelf a box of videotapes of the type used in the Weddingtons' eight-millimeter camcorder. She testified that some of the tapes were marked "family" in Weddington's handwriting. Paula testified that she had never seen those tapes before, and she inserted them into the camcorder and started fast-forwarding through them while she was talking on the telephone. Paula testified that on two of the videotapes she saw Weddington and M.V., T.V.'s four-year-old daughter. She also testified that M.V. was on a bed Paula recognized as being in the bedroom of her and Weddington's son. Paula testified that the videotapes showed Weddington placing his mouth on the child's genital area and inserting his "pinky finger" into the child's vagina. Paula said she then told T.V., "I have to go," and hung up the telephone. She took their two children and the tapes and went to a relative's home.
The next day, Paula consulted an attorney, who advised her to disclose the content of the tapes to M.V.'s parents. She did so, and thereafter she and T.V. filed reports with the local police department. Paula gave the videotapes to the police chief. Subsequently, law-enforcement officers searched the Weddingtons' residence and Danny Weddington's vehicle, seized numerous items, and arrested Danny Weddington. The police chief testified that the videotapes were sealed in an envelope after Paula gave them to him, kept in the care of the police, and were not altered. Paula also testified that she knew how the camcorder worked and that it was in working order when she found the videotapes. Weddington also testified that he often used their camcorder for work-related and family videotaping.
Paula testified that in a telephone conversation with Weddington after he was arrested, when she asked Weddington why he would hurt an innocent child, he replied, "I'm sorry." Weddington also gave the following written statement:
 "I Danny Weddington, don't understand how I got involved with this (looking at child porn). I started by looking at reg. porn on the [I]nternet then stumbled onto child porn at different sites. I did download some pictures at home. I am first very sorry I searched for underage porn. I could not believe such things were out there on the [I]nternet. This seemed to be like an addiction of some sort. I have repented of my sins and had forgot I still had the tapes, which was the only time I done something this stupid. I was making a tape of me and my wife and was very drunk when the tapes were made (both on the same date). I do confess my sin and myself don't understand why and have already repented and refrain from looking at such sick stuff. I know this doesn't mean much, but [I] want [to] beg forgiveness both from my family and the public and most of all from the family which was the victim. I got addicted to porn which [led] to this. The only time and the only person which I committed *Page 753 
this sin is on the 2 tapes. I wish I never searched for underage nude pictures. I swear I will never do or will ever think of such stuff again. I have committed an immoral sin and ask God, family and public for forgiveness. I don't want my kids to look at porn, but yet [I] did and got addicted to it which [led] to much worse things. I did not receive any satisfaction from this action I have done. . . ."
At trial, however, Weddington testified that the videotapes did not depict him with M.V. and that the room shown on the tapes was not his son's room. Rather, he stated that the videotapes contained files and images he had downloaded from the Internet. Weddington admitted that he had downloaded child pornography from the Internet and had transferred it to tapes, compact discs, and floppy disks.
During their marriage, Paula had participated with Weddington in downloading adult pornography from the Internet. However, Paula testified that she was not aware of any child pornography in their house until she found the videotapes. Weddington had also videotaped himself sexually abusing Paula while she was unconscious. Weddington claimed that the tapes he referred to in his written statement were the videotapes he had made of himself having sexual intercourse with his unconscious wife.
Weddington testified that when he was arrested he was told only that he was being charged with "possession of pornography, production of pornography, sexual abuse, and sodomy." He also testified that he remembered an officer telling him after he arrived at the police station that the officer's brother-in-law had gotten involved in child pornography and had committed suicide after molesting a child, but Weddington testified that he ignored this comment. Investigator Zac Johnson, who participated in questioning Weddington and who was present when Weddington gave the written statement, testified that he asked Weddington why he did this to M.V., that M.V.'s name was mentioned to Weddington several times, and that Weddington admitted that he was the person on the tapes with the little girl. Weddington then gave the previously discussed written statement while he was in the interrogation room.
At a pretrial hearing, the trial court denied Weddington's motion to suppress the videotapes Paula identified as depicting him performing sexual acts on M.V. in her son's bedroom. At trial, Weddington objected to the introduction of the tapes into evidence, arguing that they had not been properly authenticated. The trial court overruled this objection and permitted the jury to view the two videotapes.
At the hearing on the jury instructions, the State requested that the trial court give instructions based on Rutledge v. State, 745 So.2d 912
(Ala.Crim.App. 1999), concerning the charges of possession of obscene matter and production of obscene matter. The State also requested that the trial court instruct the jury that the "electrical or electronic reproduction" prohibited by Alabama's anti-obscenity statutes includes computer images depicting child pornography and that the statutes creating the offenses Weddington was charged with prohibit the possession of child pornography by any means, including visual depictions displayed on a computer or computer diskettes, and found on the Internet.
Weddington, through counsel, argued that the requested instructions should not be given because, counsel argued, to be found guilty of producing child pornography the defendant must be present with the child. The trial court overruled Weddington's objection and instructed the State to prepare a proposed jury instruction. *Page 754 
After a break, the trial court stated that the jury charges previously discussed had been submitted, that the defendant's exceptions were incorporated and overruled, that the court would give the charges, and that Weddington was granted a continuing exception.
As to the count charging production of obscene matter, the trial court instructed the jury as follows:
 "The defendant is charged with the production of obscene matter. Any person who knowingly films, prints, records, photographs or otherwise produces any obscene matter that contains a visual reproduction of a person under the age of 17 years engaged in any act of sadomasochistic abuse, sexual intercourse, sexual excitement, masturbation, breast nudity, genital nudity, or other sexual conduct shall be guilty of a Class A felony."
The trial court then stated,
 "I have some definitions to read on some of the matters that I've just read to you, but I'm going to go ahead with Count Four, which is possession of obscene matter and read that to you and then I'll go back and read some of these definitions that would apply to either one or more or both of these statutes."
After reading the charge on possession of obscene matter, the trial court defined several terms it said applied to both the charge of possession of obscene matter and the charge of production of obscene matter. The trial court defined "matter" as follows:
 "Matter. Any book, magazine, newspaper or printed — or other printed material or any picture, photography, motion picture or electrical or electronic reproduction or any other articles or materials that either are, or contain a photographic or other visual reproduction of a live act, performance or events."
The trial court also stated:
 "As used in the statutes applicable to this case, the terms `electrical or electronic reproduction of a photographic or other visual reproduction' includes computer images depicting child pornography.
 "Section 13A-12-192 prohibits the possession of child pornography by any means, including visual depictions of children engaged in sexual acts displayed on computers, computer diskettes, and the Internet."
 "Under these statutes, the production of child pornography by any means is prohibited."
After concluding the jury instructions, the trial court held an off-the-record discussion with counsel. Afterward, the trial court asked the jury to retire and begin its deliberations. The trial court then went back on the record and stated:
 "Let the record reflect that the defendant's exceptions to the requested jury charges were timely made and that they have been made again and are incorporated by reference."
The trial court again overruled Weddington's objections.
 Discussion
The Court of Criminal Appeals affirmed the convictions in an unpublished memorandum. We granted Weddington's petition for certiorari review of the decision of the Court of Criminal Appeals. Weddington argues that the Court of Criminal Appeals erred in concluding: (1) that the videotapes that allegedly showed him engaging in sexual acts with M.V. were not privileged as communications made during his marriage; (2) that the tapes had been properly authenticated; (3) that the trial court had properly excluded as irrelevant *Page 755 
other pornographic videotapes Weddington had downloaded from the Internet; and (4) that he had not preserved for appellate review his objection to the jury instructions on the production-of-obscene-matter count.
The Court of Criminal Appeals held that the videotapes that were shown to the jury, which Weddington admits contain child pornography, were not privileged communications because there was no evidence tending to show that the making of the tapes and the storing of the tapes in the closet grew out of the confidence inspired by the marital relationship of Paula and Weddington. The Court of Criminal Appeals also held that the trial court did not abuse its discretion in excluding on relevancy grounds Weddington's other pornographic videotapes. We agree with those holdings; we see no need for any further discussion of those issues.
Weddington also argues that the Court of Criminal Appeals erred in holding that the State established the proper predicate for admission of the videotapes under the "silent-witness" theory. Weddington argues that the State did not lay the proper predicate for the admission of the tapes because, he says, it did not provide evidence (1) showing how the device by which the videotapes were created works, (2) showing how the device ensures reliability, (3) showing that "the device . . . was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded," and (4) showing that the operator of the device that produced the videotape was competent. Ex parteRieber, 663 So.2d 999, 1008 (Ala. 1995).
The State presented the testimony of Paula, Investigator Johnson, and the police chief. All three testified that the videotape depicted Weddington performing sexual acts on M.V. Investigator Johnson further testified that Weddington admitted before he gave his written statement that he was the person depicted on the videotape with M.V. Moreover, Weddington's written statement can be interpreted as an admission that he made the videotape in which he appeared with M.V. Although Weddington's testimony at trial provided an interpretation of the statement that was consistent with his innocence of an activity with M.V., the jury could reasonably have found that Weddington's written statement was an admission that the videotape accurately depicted him sexually abusing M.V. See Rule 901(a), Ala. R. Evid. ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). T.V. also testified that she had been shown a freeze-frame of the videotape and she identified the girl on the tape as her daughter M.V. Paula further testified that the videotape "fairly and accurately depicted" her son's bedroom and the comforter on his bed. Paula testified that she found the tapes in the bedroom closet of the bedroom she and Weddington shared and that the tapes were labeled in Weddington's handwriting with a "1" and a "2" and that the letter "M" was written on both tapes. She also testified that the videotapes were of the type used in her husband's camcorder and that she had viewed the videotapes on the camcorder. Paula further testified that the camcorder was in working condition and that she and her husband used the camcorder to videotape family activities. The police chief testified that the videotapes introduced at trial had not been altered in any way.
Weddington also testified: "[T]hese are my tapes and, so, if there's pornography on there, then I don't deny." However, Weddington maintained that the tapes contained *Page 756 
child pornography he had downloaded from the Internet and testified, "From what I can see, it isn't [M.V. on the tapes]." Weddington also testified that he used the camcorder to videotape things at work and that he had previously produced two videotapes of him sexually abusing Paula while she was unconscious.
Weddington relies upon Voudrie v. State, 387 So.2d 248 (Ala.Crim.App. 1980), in which the Court of Criminal Appeals established a seven-part test for the admissibility of sound recordings. This test requires a showing as to (1) technical information as to the operation of the recording device, (2) the expertise of the operator, (3) the accuracy of the recording, (4) the absence of changes, additions, or deletions, (5) the manner of preservation, (6) the identity of the persons speaking on the recording, and (7) the involuntariness of the statement made in the recording. Subsequent cases such as Carraway v. State, 583 So.2d 993
(Ala.Crim.App. 1991), and Molina v. State, 533 So.2d 701 (Ala.Crim.App. 1988), applying the Voudrie test were analyzed by this Court in Ex parteFuller, 620 So.2d 675 (Ala. 1993). In Fuller, this Court upheld the admissibility of a tape recording of a statement given by the defendant while he was in custody. In Fuller, this Court recognized two distinct theories with respect to determining whether a proper foundation has been laid for the admissibility of photographs and electronic recordings.620 So.2d at 678. First, is the "pictorial-communication" or "pictorial-testimony" theory; under this theory a person who was present at the time the recording was made can authenticate the recording by stating that it is consistent with his recollection. Fuller,620 So.2d at 678. The second theory is the "silent-witness" theory, which comes into play when "there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question." Fuller,620 So.2d at 678. Under the silent-witness theory a foundation is laid by offering evidence as to the validity of the process or mechanism based upon the seven-part test established in Voudrie. In Ex parte Rieber, this Court applied both theories in upholding the admissibility of a surveillance video where in some instances witnesses who appeared on the tape could authenticate its accuracy and in other instances Voudrie-based foundational requirements were satisfied.
Weddington contends that the silent-witness theory controls in this case and that the State failed to offer sufficient evidence to satisfy the foundational requirements established in Voudrie. Weddington contends that the absence of expert testimony concerning video systems generally, the absence of evidence as to the qualifications of the operator, and the absence of testimony of a witness familiar with converting Internet images to videotape require the conclusion that the foundational requirements of Voudrie were not satisfied and that the videotapes should, therefore, not have been admitted.
At trial, the State argued that Voudrie did not apply because, it argued, the production and possession of child pornography were, in themselves, the crime. Moreover, the State contends that it laid an adequate foundation for the admission of the tapes for the purpose of presenting evidence indicating Weddington's sexual misconduct, pointing to the previously summarized evidence, including Paula's identification of the accuracy of the depiction on the videotape of the bedroom in the Weddingtons' house, the accuracy of the depiction of M.V. and Weddington, the capability of the camcorder to produce videotapes based on Paula's knowledge of *Page 757 
how the camcorder worked, the presence of Weddington's handwriting on the videotapes, and the testimony of the police chief as to the handling of the tapes once they were turned over to him.
The Court of Criminal Appeals agreed with the State, noting that it had previously stated in Molina v. State, 533 So.2d at 711, that "`[a]s long as satisfactory evidence of the integrity of the film or videotape is presented, stringent foundational requirements, such as proof of the continuous chain of custody, are now almost universally rejected as unnecessary.'" (Quoting C. Scott, 3 Photographic Evidence § 1297 (2d ed. 1969) (1987 Pocket Part)).
The difficulty in applying previously developed rules to the facts of this case arises from its unique status as involving a video the defendant himself is charged with producing. We agree with the State that strict adherence in this case to the foundational requirements applicable to the silent-witness theory is inappropriate. This case should be considered under the pictorial-communication theory because the person appearing on the videotape has given evidence in his written statement and his comment to the police officer that supports the accuracy of the videotape. According to the police officer, Weddington admitted that he was the person depicted on the tapes with M.V. As previously noted, the jury had before it a written statement that could also be construed as consistent with this admission. In Fuller, 620 So.2d at 678, this Court limited the application of the silent-witness theory to instances where "there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question." We leave for another day the question whether the foundational requirements necessary to proceed under the silent-witness theory should be relaxed when the defendant is charged as the maker of the videotape and there is insufficient evidence to satisfy the foundational requirements of the pictorial-communication theory.
Finally, Weddington argues that the Court of Criminal Appeals erred in holding that he did not preserve for review his objections to the State's requested jury instructions on the production-of-obscene-matter count. In its unpublished memorandum, the Court of Criminal Appeals stated,
 "[Weddington] argues that the trial court improperly instructed the jury on production of child pornography based on instructions the State requested. However, he did not object after the trial court indicated that it would give the requested instructions, and he did not object after the trial court's oral charge. Therefore, this argument is not properly before this court. See Rule 21.3, Ala. R. Crim. P.; Bullock v. State, 697 So.2d 66 (Ala.Crim.App. 1997)."
During the jury-charge conference, the State asked the trial court to instruct the jury that "electrical or electronic reproduction," included in the definition of "matter" in § 13A-12-190, Ala. Code 1975 (the Code section that defines the offense of possession of obscene matter), includes computer images of pornography. The State also asked the trial court to instruct the jury that the possession of child pornography by any means, including computer images or images stored on computer diskettes, is prohibited by the statute. Immediately thereafter, Weddington, through counsel, argued that the requested charges should not be given because, counsel argued, the offense of production of child pornography, as distinguished from possession of child pornography, required that the defendant be physically present with the child during the production of the obscene *Page 758 
matter. After Weddington's counsel completed his argument, the trial court stated, "Overruled. We'll give it," and asked the prosecutors to draft a jury instruction. The prosecutors did so, and the trial court again stated that Weddington's exceptions to the instructions were incorporated and were overruled, and he gave Weddington a continuing exception to the jury instructions.
The trial court then read the instructions to the jury. Immediately after the trial court read the instructions, but before the jury was excused, the trial court requested a bench conference with the attorneys. After this conference the trial court excused the jury and then stated that the defendant's objections to the jury charges were timely made, were incorporated by reference, and were overruled.
In his brief to this Court, Weddington does not challenge his conviction for possession of obscene matter. He concedes that the videotapes introduced into evidence at trial were made by him and that those videotapes depict child pornography. However, he argues that the videotapes contain child pornography he downloaded from the Internet and that they do not depict him performing sexual acts on M.V.
Rule 21.3, Ala.R.Crim.P., states:
 "No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury."
See also Woods v. State, 845 So.2d 843
(Ala.Crim.App. 2002). In its brief to this Court, the State acknowledges that, contrary to the statement of the Court of Criminal Appeals, "Weddington did raise an objection to the State's requested charge." (State's brief at p. 23.) Because Weddington objected to the proposed jury instructions when the trial court indicated it would give the instructions and again after the trial court gave the instructions, but before the jury retired, his objections were timely. Rule 21.3, Ala.R.Crim.P.
The State, nevertheless, argues that Weddington did not preserve the issue for appeal because, it says, he did not object specifically on the ground that the State's requested instructions would permit him to be convicted of "producing" child pornography merely as a result of his downloading it from the Internet. To preserve an issue for appeal, a defendant's objection must be specific enough "to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury." Ex parte Works, 640 So.2d 1056, 1058
(Ala. 1994), Ex parte Washington, 448 So.2d 404, 406 (Ala. 1984). Weddington's objection that the State's requested jury instructions would permit a person to be convicted of production of child pornography without his being physically present with the child was sufficient to put the trial court on notice of the alleged error, and thus to preserve for appellate review his objection to the jury instructions on the charge of production of obscene matter. In holding that Weddington's objections preserved the alleged error for appellate review, we do not reach the question whether the jury instructions were, in fact, erroneous, or if so, whether the error was harmless.
We reverse the Court of Criminal Appeals' judgment and remand the case for that court to consider Weddington's objections to the trial court's jury instructions on the production-of-obscene-matter count. *Page 759 
As to all other issues, the opinion of the Court of Criminal Appeals is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.*
Moore, C.J., and Houston, See, Brown, Johnstone, Harwood, Woodall, and Stuart, JJ., concur.
* Note from the reporter of decisions: On August 23, 2002, after remand from the Supreme Court, the Court of Criminal Appeals affirmed, without opinion.